Edgar L. McVICKER, Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF CADDO of the State of Oklahoma, Ruby Trotter, County Treasurer of Caddo County, Oklahoma, Jack Van-Deventer, County Clerk of Caddo County, Oklahoma, and Frank Bryson, County Assessor of Caddo County, Oklahoma, Defendants.

No. 42764.

Supreme Court of Oklahoma.

May 21, 1968.

As Amended June 18, 1968.

**298**

Haskell B. Pugh, Anadarko, for plaintiff.

George J. Fagin and Andrew J. Haswell, Jr., Oklahoma City, for defendants.

BLACKBIRD, Justice.

The present action, instituted by plaintiff as a taxpayer of Caddo County, is a sequel to a previous one, McVickers v. Zerger, Okl., 389 P.2d 977, brought by a similarly named individual, and other taxpayers of said County's county seat city, Anadarko, after the people of Oklahoma, by their vote on State Question #404, Referendum Petition No. 133, at a special election in May, 1962, adopted an amendment to Art. X of our State Constitution, by adding to its pro-· visions, among others, those now contained in Sec. 35 of said Article. As said Article X existed previous to said amendment, the voters of any "county, city, town, township, school district, or political corporation, or subdivision of the State * * *", *could not*, under the provisions of said Article's Sec. 26, *give their assent to its incurring any "indebtedness,* in the aggregate *exceeding five percentum* of *the valuation* of the taxable property therein *to be ascertained from the last assessment for State and county purposes previous to the incurring of such indebtedness:* * * *"*. (Emphasis added).

By its paragraph "(a)" the new Sec. 35, supra, authorized "Any incorporated town and any county * * *" to issue, with the consent of its qualified taxpaying voters voting on the question at an election held for the purpose, bonds in sums "provided by such majority" at such election, for the purpose of securing and developing industry within or near said municipality or county.

Paragraph "(c)" of said Sec. 35, provides:

"To provide for the payment of all such bonds outstanding, principal, and interest as they mature, the municipality or county *may levy a special tax,* payable annually, in a total amount *not to exceed five (5) mills on the dollar, in addition to the legal rate permitted,* on the real and personal taxable property therein; provided, how-

ever, the municipality or county may, from time to time, suspend the collection of such annual levy when not required for the payment of its bonds; and provided further, however, that in no event shall the real and personal taxable property in any city or town be subject to a special tax in excess of five (5) mills for bonds issued hereunder." (Emphasis added).

In their petition, the plaintiffs in Mc-Vickers v. Zerger, supra, alleged that Anadarko's Mayor Zerger, and the other defendants therein, were planning to call an election for voting on the question of whether said City would issue and sell bonds for the purpose prescribed in the newly adopted Sec. 35, supra; and plaintiff therein asked for an injunction against such election. One of the issues submitted to this Court in said original action was whether or not the debt limitation contained in Sec. 26, supra, applied to industrial bonds issued under Sec. 35, supra. We answered that question in the negative, holding that the five (5) mill levy authorized by Sec. 35 was "over and above the restrictions of Section 26, * * *".

Thereafter, it was apparently decided at Anadarko to hold an election to determine whether Caddo County should issue industrial development bonds under Sec. 35, supra. Accordingly, at such an election on April 5, 1966, such a bond issue totalling $2,800,000.00 was approved by the requisite number of said County's voters; and, thereafter, pursuant to said election, bonds known as "General Obligation Limited Tax Bonds of 1967 of Caddo County" were issued; and, thereafter, such bonds, in the total amount of $2,085,000.00 were sold and delivered in two separate lots, and amounts, in July, 1966, and October, 1967, respectively.

In the meantime, the first regular session of the Thirty-First Oklahoma Legislature enacted its Senate Bill No. 316 (O.S.1967, Chap. 64, pp. 99, 100; Tit. 62 O.S.1967 Supp., §§ 495 and 496) which became effective April, 1967, and reads as follows:

"The Legislature expressly states that its intention when submitting to a popular vote the proposed amendment to Article 10, Section 35, Oklahoma Constitution, in Senate Joint Resolution No. 12 of the Twenty-eighth Legislature, and its interpretation thereof as to making a tax levy not to exceed five (5) mills on the dollar on the bonds issued thereunder to secure and develop industry in the event the net taxable valuation of the counties or municipalities declines subsequent to the issuance of such bonds. This interpretation will assure the investing public that principal and interest of such bonds will be paid as they become due, and will aid the marketability of such bonds.

"Counties, cities and towns which shall or have issued bonds under authority of Article 10, Section 35 of the Constitution shall levy *a special tax payable annually* in a total amount not to exceed five (5) mills on the dollar *in addition to the legal rate* permitted on the real and personal taxable property therein to provide for the payment of the principal and interest as they mature of all bonds heretofore or hereafter issued under authority of Section 35, Article 10 of the Constitution; provided, however, the county or municipality may, initially and from time to time thereafter, suspend the collection of such *annual levy* when not required for the payment of the principal of and interest on its bonds; and provided further that *in event total net taxable valuation of the issuing county or municipality has declined from that in existence at time bonds were issued,* and if necessary to assure payment of principal and interest on the bonds, *a special tax up to five (5) mills shall be levied on the real and personal taxable property therein based on the issuer's total net taxable valuation* in existence at time bonds were issued."

The present original action was commenced in November, 1967. In the application he has filed herein praying this Court to assume jurisdiction, plaintiff alleges, in

substance, that Caddo County's Board of County Commisioners has received numerous applications 'from industrial and manufacturing concerns for allocation of the proceeds of that part of the total amount of industrial development bonds which were authorized, or approved, by Caddo County voters, as aforesaid, but have never yet been issued. It is further alleged, however, that the Board has been unable to do this, because it was required by the national bureaus—that had to give the previously marketed bonds a market rating before they could be sold—to covenant that the County would not issue more of such bonds than could be covered 1¼ times, "as to debt service", by a levy of 5 mills on the dollar of the assessed valuation of property in Caddo County. It is further made to appear from the application and petition filed herein that, if the above quoted S.B. #316 is constitutional, and Caddo and fifteen other counties wherein voters have approved industrial development bond issues, may offer bond buyers the added security —in case their annual valuations subsequently decline—of special 5 mill levies *based upon* their respective *property valuations for the years in which the bonds were issued,* such county commissioner boards will not be required to enter into such covenants, and there will be more bidders, and parties competing to buy such bonds, than the lone bidder who has purchased such bonds in the past.

But plaintiff alleges that S.B. #316 is unconstitutional, as in violation of Sec. 26, supra; and that, notwithstanding this, the defendant County Commissioners are threatening to sell the remaining authorized, but unissued, General Obligation Limited Tax Bonds of Caddo County, and to advertise them as secured (concerning payment) by Caddo County's ability, under said Bill, to make special levies in any future years, that the property in said County may decline in valuation. Plaintiff prays this court to enjoin defendants from such application of this recently enacted, and allegedly unconstitutional, legislative act.

The parties seem to agree that the defendants' threatened acts and the issue, presented herein, as to whether the Oklahoma Legislature's enactment of S.B. #316, as §§ 495 and 496, supra, was an attempt to enlarge the scope of the constitution amendment effected by the voters of this State in adopting Sec. 35, supra, is of sufficient statewide concern, and importance, to warrant this Court in assuming jurisdiction and granting the injunction prayed for, if plaintiff's position is correct.

To support their contention that, by adopting Sec. 35, supra, as an amendment to this State's Constitution, the voters of Oklahoma authorized the change that S.B. #316 purports to authorize, in the annual property valuations upon which county levies to defray bonded indebtedness were theretofore made under Sec. 26, supra, defendants rely on this Court's hereinbefore partially quoted statement in McVickers, supra, to the effect that the 5-mill levy authorized by Sec. 35 was "over and above the restrictions of Section 26 * * *". That this statement pertained only to the millage, or rate of levy, rather than to the valuation, upon which such levies were to be made, is clear from considering that statement in the context in which it was used. There is nothing in the wording either of the Ballot Title of State Question No. 404, supra, (Depicted in McVickers, supra) or any provision of Sec. 35, supra, to imply, or infer, that the "special levy", thus authorized, was to be based upon any valuation other than that previously authorized by Sec. 26, supra, namely: the valuation of the taxable property therein to be ascertained from the last assessment for State and County purposes. In speaking of the levy limitation, this Court, in State ex rel. Board of Education of Town of Salina v. Williamson, 182 Okl. 97, 100, 76 P.2d 384, 387, said:

"While the framers of the Constitution in adopting section 26 of article 10 * * * *evidently realized that valuations would fluctuate from year to year,* hence fixed a standard or mathematical formula to be used in all cases looking towards a

proposed indebtedness. The sum of existing indebtedness and the proposed bonded indebtedness must not aggregate more than 5 per centum of the valuation of the taxable property in the political subdivision seeking to become indebted. *This valuation is to be ascertained from the last assessment* for state and county purposes."

And, in Eaton v. St. Louis-S. F. Ry. Co., 122 Okl. 143, 149, 251 P. 1032, 1037, we said:

"The words, 'nor in cases requiring such assent, shall any indebtedness be allowed to be incurred, etc.,' had been given a definite and emphatic interpretation by the Supreme Court of the United States in City of Litchfield v. Ballou [114 U.S. 190, 5 S.Ct. 820, 29 L.Ed. 132], and Doon Twp. v. Cummins, supra [142 U.S. 366, 12 S.Ct. 220, 35 L.Ed. 1044], many years previous to the adoption of such language as part of our organic law. And such provision, as was observed by the Supreme Court of the United States in the authorities above cited, is not only an emphatic limitation upon the Legislature and other tax-levying agencies of the state and its municipalities, but constitutes a solemn binding agreement and compact among the people, which by its adoption was entered into by the people, by which they agreed and bound themselves, as well as their chosen representatives, that their property should not be taxed in any one year to pay any debt in excess of 5 per cent. of the assessed value of their property. They had an absolute right to enter into such agreement and make it a part of their organic law, and, having done so, they have a right to demand that it be observed as a protection against confiscation of their property through excessive taxation."

We think it is obvious that if, in any year, after county industrial development bonds are issued, the tax valuation of property in said county declines, a five (5) mill levy based upon a higher valuation, could be made, this, in effect, would be a greater levy

than the five (5) mills authorized in Sec. 35, supra. In practical result, it could be the equivalent of increasing the rate of levy authorized. It could also make the tax burden unequal on successive owners of the same property. See Missouri, K. & T. R. Co. v. Goad, 117 Okl. 129, 131, 245 P. 617, 619. If such practice were persisted in with bond issues of sufficient size, it could result in the "confiscation * * * through excessive taxation" referred to in the above quoted case, as effectively as if this were accomplished by more direct means. In Campbell v. State ex rel. Brett, 23 Okl. 109, 123, 125, 99 P. 778, 784, 785, it was said:

" * * * In the history of the framing, revising, and amending of the Constitution of the several states we have an illustration of the efforts of the people to protect themselves against the governmental taxing agency. In England it was against the crown; in the American states against the improvident assumption of their representatives. Taxes levied and derived from the people are in every instance an appropriation by the people to the government, to be expended in furnishing protection, security by the government within its proper functions, and facilities for the public welfare. This principle is a characteristic of the wake of Anglo-Saxon liberty, and has resulted as a restraint upon the government in preventing extravagant expenditures, as well as unjust and tyrannical action against the rights of private property. Property is never secure from the lawless grasp of the government, unless the means of existence of the government depend upon the voluntary grants of those who own the property. Hence we find the limitations, checks, and restraints in our Constitutions.

\*     \*     \*     \*     \*     \*

"*Authority must be shown for every levy of taxes,* not only in the state at large, but also in the political subdivisions thereof. *In the state authority is derived from the sovereign people;* in the political subdivisions, from the state; and the

same must be levied in the manner prescribed in delegating the authority. No one idea stands out more clearly than that barriers should be erected against the creation of municipal indebtedness. In times of popular clamor and excitement *the internal improvement craze often well-nigh wrecks the most flourishing counties and towns,* even in staid and conservative commonwealths. Excuses for withholding the application of these restraints, wisely devised, however, should not be made to delay expenditures *unless we find a substantial reason therefor in the organic law* of our commonwealth. \* \* \*" (Emphasis added).

We are convinced that the voters of Oklahoma did not intend, by their adoption of Sec. 35, supra, to abandon the safeguards they had previously enjoyed, under our Constitution, against taxing oppression, and, as above mentioned, there is nothing in the wording of Sec. 35, supra, to indicate that they did.

█ We cannot be induced to try to change the plain wording of this State's Constitution, by defendants' argument that Sec. 35, supra, is ambiguous. The only hypothesis for this argument is the absence of any particularity in Sec. 35, supra, as to the "valuation" referred to therein; but, with nothing in said Section's wording to imply that this valuation was intended to be any different from the valuation specified in Sec. 26, supra—which the later adoption amended—we have no reason to conclude that it was so intended, and have nothing upon which to fabricate any "ambiguity", or justification for engaging in judicial construction. As said in State ex rel. Ogden v. Hunt, Okl., 286 P.2d 1088, 1091:

"All courts recognize that if the wording of a provision of a statute or constitution is plain, clear and unambiguous, its evident meaning must be accepted and there is no reason or justification for the use of interpretative devices to fabricate a different meaning."

█ In accord with the foregoing, it is our opinion that SB #316, supra, is unconstitutional and void to the extent that it purports to authorize tax levies in violation of the limitations contained in Art. X, Sec. 26, as amended by Sec. 35, supra. As said in Faught v. City of Sapulpa, 145 Okl. 164, 180, 292 P. 15, 28, quoting In re Town of Afton, 43 Okl. 720, 144 P. 184, L.R.A. 1915D, 978:

"\* \* \* when the question of enforcing a plain provision of the organic law is presented on one side, and policies and hardships on the other, our duty is clear, and we have no choice. The plain provision of the Constitution must be obeyed and followed, not only by the courts, but by every one; and it is the solemn duty of this court, when its jurisdiction is properly invoked, to maintain and not destroy or impair the wise provisions of this sacred document. It is better that the courts preserve the organic law and protect the rights of all the people at the expense and hardship of a few rather than to relieve the few of this expense and hardship, and in so doing destroy the Constitution and jeopardize the rights of all the people. \* \* \*"

The injunction herein sought by plaintiff is granted, and the defendants are hereby enjoined from attempting to use the provisions of SB #316 in the manner alleged.

IRWIN, V. C. J., and WILLIAMS, BERRY and McINERNEY, JJ., concur.

JACKSON, C. J., and LAVENDER, J., concur in result.

HODGES, J., dissents.