**Ben Wiley JONES, Jr., Appellant,**

v.

**The STATE of Oklahoma.**

**No. F–74–744.**

Court of Criminal Appeals of Oklahoma.

Nov. 14, 1975.

Rehearing Denied Dec. 4, 1975.

Don Manners and Jay McCown, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Michael Jackson, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Ben Wiley Jones, Jr., hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Oklahoma County, Case No. CRF–73–2221, for the offense of First Degree Murder, in violation of 21 O.S.Supp.1974, § 701.1, ¶ 9. In accordance with the provisions of 21 O.S.Supp.1974, § 701.3, defendant was thereafter sentenced to suffer death, and from said judgment and sentence a timely appeal has been perfected to this Court.

At the trial, the State endeavored to establish by circumstantial evidence that the defendant committed the offense in an attempt to make himself appear to be the victim of the murder and thereby avoid confinement for another offense. The evidence tended to establish that the defendant entered a plea of guilty to State robbery charges on July 26, 1973, pursuant to an agreement with State and Federal authorities whereby he was then released from custody and judgment and sentencing was passed until August 27, 1973, at which time the State would recommend a probationary sentence if the defendant had assisted the Secret Service by providing that agency with information regarding local

counterfeiting operations to which he purportedly had access, but if the defendant failed to provide such assistance he was warned that the State would recommend a substantial sentence of incarceration. The defendant thereafter did not provide the Secret Service with such information and failed to report regularly as directed. In the afternoon of August 11, 1973, the defendant borrowed a blue and white four-door Oldsmobile then in possession of Mary Magdeline Moore but belonging to the defendant's aunt, Mackie McFee. While driving that car, the defendant then checked into room 207 of the Sooner Inn Motel at about 8:30 p.m. that evening along with a female companion, Renita Williams. The couple left the motel about four hours later at approximately 12:40 a. m. on August 12, 1973, and the defendant drove Miss Williams directly home where he departed at about 1:00 a.m. Prior to leaving Miss Williams, however, in speaking of reincarnation, the defendant told her, "If I die, don't worry because I will be back." (Tr. 350) Early that same morning the defendant was observed picking up 13-year-old Ruben Junior Ellis for a ride to the bus station while driving a two-tone dark green or black four-door automobile by the mother of the child, Amy Lee Ellis, who placed the time at about 12:00 to 12:30 a.m. At about 4:00 a.m. that morning the defendant returned the Oldsmobile to his aunt who did not then see him again until after he was arrested for this offense. The body of Ruben Junior Ellis was discovered at about 2:00 p.m. that day in the bathtub of room 207 of the Sooner Inn Motel by an employee and the authorities were notified. The pathologist established that death had occurred sometime within the period from about 4:00 p. m. on August 11, 1973, to 10:00 a.m. of the following day. Blunt force trauma to the head had caused some injury to the brain, but death was due to manual strangulation through the use of someone's hands. After death the lower portion of the body was partially burned while in the bathtub with the use of a flammable liquid. The autopsy revealed no evidence of a sexual assault. Shoestring laces were found tied around the victim's ankles, and a ring and medallion identified as belonging to the defendant were found upon the body together with a partially burned wallet containing defendant's personal identification. This jewelry was last seen by Miss Williams on a table in the motel room when she and the defendant departed there the previous night. The victim's fingerprints, however, did not match those of the defendant's on file. State and Federal authorities then undertook efforts to locate the defendant without success, and he failed to appear for judgment and sentencing in State court on August 27, 1973, but was apprehended in December of that year in Los Angeles, California.

Defendant sought to prove that he fled in fear of reprisal from those involved in the counterfeiting operations upon which he was to provide information to the Secret Service, and was in flight when the subject offense occurred. Further, he endeavored to establish that the murder was more probably attributable to one George Jackson, Jr., also known as "Diablo." The defendant testified that shortly after he was released from custody on the robbery charges he learned through others that those involved in the counterfeiting operations had become aware that he was acting as an informant. After he left Miss Williams at about 1:00 a.m. on August 12, 1973, the defendant related that he went to Eddy Henry's Cafe where at about 3:00 a. m. he saw Gerald Pulliam and "Diablo," and the latter told the defendant that he was supposed to be killed by an individual upon whom he had agreed to provide information. The defendant testified that he then gave the key to room 207 of the Sooner Inn Motel to Gerald Pulliam so that he could retrieve the jewelry and billfold that the defendant had left there. Defendant explained that he had left the jewelry and billfold in the motel room when he previously departed with Miss

Williams because he was rushed since her mother expected her home by 12:30 to 1:00 a.m. At about 4:00 a.m. that morning, the defendant testified that he then went to his aunt's home to return her car, pack some clothes and borrow some money. When Gerald Pulliam then failed to bring the defendant's jewelry and billfold, the defendant testified that at about 5:00 a.m. that morning he called a cab for transportation to the bus station where at about 6:30 a.m. he caught a bus to Boston, Massachusetts. Other witnesses established that at about 8:00 a.m. that morning the Fire Department investigated an accumulation of smoke in the area of room 207 of the Sooner Inn Motel, but then left when no fire was discovered. Other testimony was offered to establish that the defendant was not acquainted with the deceased, but that the deceased had previously been seen in the company of "Diablo" who was known to sexually molest young males. The defendant admitted prior convictions for grand larceny and robbery, and that he used an alias while in flight.

The defendant presents seven assignments of error which insofar as possible will here be considered in the order in which they arose in the trial court below.

■ In his fourth assignment of error the defendant contends that the trial court erred in refusing to grant his application for an order committing him to a State hospital for mental observation and examination pursuant to 22 O.S.1971, §§ 1171 and 1172. At the hearing upon that application, which was presented one week prior to the scheduled date for trial, the defense attorney refused to place the defendant upon the witness stand and offered no evidence in support of the application, but as appears from the separate transcript of those proceedings, defense counsel did state that:

"The thrust of this motion, your Honor, is that I have been with Mr. Ben Jones and each time I talk to him I get a different array of circumstances. I don't feel like he is helping me prepare his defense, whether that is from some other reason than competency is questionable. I feel like since he has advised me only today that he was discharged from the United States Marine Corp for psychological problems and since this is a case involving, if he is convicted, the electric chair, that it would do no violence to the State and would protect the defendant fully if the Court would see fit to send him down for a mental determination." (Tr. 2 and 3)

In reply thereto the prosecutor asserted that:

" . . . The Court has no sworn testimony before it from which to rule and we would argue that we have talked to Ben Wiley Jones too at some length over some period of time and within the last couple of weeks the last time. He has been in court and testified under direct examination and cross examination. There was never any issue raised as to his mental competency by his counsel or by the Court, or by the prosecution, there has never been any question about it. He answered all questions candidly and any questions that he had any question about that might incriminate him, he would hesitate to answer and would not answer, or would answer in a way that would protect himself. There wasn't any question in my mind but what he knew just exactly what he was doing, exactly where he was and just exactly what he was charged with, and just exactly what was going on." (Tr. 3 and 4)

The following language pertinent to a resolution of this assignment appears in the Syllabus to *Haynes v. State*, Okl.Cr., 473 P.2d 299 (1970):

"Whether the defendant should be committed to a mental institution for observation is to be determined by the trial judge upon the evidence before him, and unless it is of such a nature as to create a doubt in his mind as to defendant's sanity, he is justified in denying defendant's request.

"The existence of a doubt as to defendant's sanity must arise from facts and circumstances of a substantial character. There must exist reasons to believe that the claim of insanity made on behalf of the accused is genuine and not simulated as a means of defeating or delaying justice and these questions must be decided by trial judge.

"The finding of the trial judge in this respect will not be disturbed on appeal unless his finding was contrary to the evidence and a clear abuse of discretion is shown."

The only cases cited by defendant tending to support this proposition are *Johnson v. States*, 73 Okl.Cr. 370, 121 P.2d 625 (1942), and *Berwick v. State*, 94 Okl.Cr. 5, 229 P.2d 604 (1951). However, each of those cases recognized that a claim of present insanity should be supported with a reasonable showing or tender of proof in support thereof, and such proof was presented by affidavit or otherwise specifically setting forth the basis therefor. We have previously recognized that when based upon several conferences with the accused the sworn representation of defense counsel as to present insanity may require a finding of doubt by the trial court absent proof or circumstances to the contrary. See, *French v. State*, Okl.Cr., 397 P.2d 909 (1964), and *Franklin v. State,* Okl.Cr., 509 P.2d 161 (1973). However, in the present case the unsworn and rather inconclusive representations of defense counsel bearing upon defendant's sanity were refuted by the prosecutor's own observations based upon the defendant's recent conduct. In view of the failure of the defendant to offer any evidence in support thereof and refusal to submit to pertinent questioning, we are of the opinion that the ruling of the trial court did not constitute an abuse of discretion. Also see, *Tucker v. State*, Okl.Cr., 473 P.2d 332 (1970) and *Mayfield v. State*, Okl.Cr., 488 P.2d 1311 (1971). In passing, we also observe from the record that subsequent to that hearing, but prior to trial, the defense attorney made arrangements for the defendant to be examined by a licensed medical doctor specializing in medical hypnosis. Although as subsequently discussed herein that examination was for different purposes, we are impressed that such an examination would have yielded expert testimony which defense counsel could have used to renew the application for mental commitment if that application were worthy of merit.

■ In defendant's seventh assignment of error he essentially contends that the death sentence cannot be imposed because the jury "was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction," in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968). The defendant acknowledges that in voir dire examination each of the six veniremen who he now contends to have been improperly excused responded negatively to the following question:

"... In a case where the law and evidence warrants, in a proper case, could you without doing violence to your conscience, agree to a verdict imposing the death penalty?"

The veniremen then responded affirmatively to the following additional question:

"... Are your reservations about the death penalty such that regardless of the law, the facts and circumstances of the case, you could not inflict the death penalty if you found beyond a reasonable doubt that the Defendant was guilty of murder in the first degree?"

We are of the opinion that such voir dire examination did meet the requirements of *Witherspoon*, supra. See, *Koonce v. State*, Okl.Cr., 456 P.2d 549 (1969), death sentence modified to life imprisonment pursuant to *Furman,* infra, 502 P.2d 1048 (1972). However, in the recent case of *Justus v. State*, Okl.Cr., 542 P.2d 598 (1975), this Court held that the applicabili-

ty of *Witherspoon* was limited to those cases where the jury has discretion to resolve whether the defendant shall suffer death or some lesser degree of punishment upon conviction for the offense charged, and under the provisions of 21 O.S.Supp. 1974, § 701.1 et seq., we observed that:

" . . . The people have, through the Legislature, predetermined that such offenses are proper cases for the exclusive assessment of capital punishment, and the pertinent voir dire inquiry is whether in view thereof, the veniremen can deliberate upon the evidence impartially under the law and assess such punishment should guilt be established beyond a reasonable doubt."

We therefore hold this proposition to be wholly without merit.

In the fifth assignment of error the defendant contends that the trial court erred in admitting additional photographs of the victim, State's Exhibits No. 8 and 9, since they were cumulative to State's Exhibit No. 7 and of no probative value being offered solely to inflame the jury. In support thereof, he relies principally upon *Oxendine v. State*, Okl.Cr., 335 P.2d 940 (1958). However, that case is readily distinguishable for there the State was permitted to display upon a screen color photoslides of the nude body of the murdered victim at the morgue after extensive autopsy surgery, and the slides were of no probative value upon any material issue.

■ This Court has repeatedly recognized that the introduction of photographs taken subsequent to a homicide is largely within the discretion of the trial court and not a cause for reversal absent an abuse thereof. See, *Pate v. State*, Okl.Cr., 361 P.2d 1086 (1961). Further, the principle of law to be drawn from *Oxendine*, supra, is set forth in paragraphs 2 and 3 of the Syllabus thereto, as follows:

"If the principle effect of demonstrative evidence such as photographs is to arouse the passion of the jury and inflame them against the defendant be-

cause of the horror of the crime, the evidence must be excluded.

"On the other hand, if the evidence has probative value with respect to a fact in issue that outweighs the danger of prejudice to the defendant, the evidence is admissible even if it is gruesome and may incidentally arouse the passions of the jury."

Also see, *Vavra v. State*, Okl.Cr., 509 P.2d 1379 (1973) and *Hopkins v. State,* Okl. Cr., 506 P.2d 580 (1973), together with case authority collected therein.

■ The black and white photographs here complained of were in no manner comparable to the color photoslides taken subsequent to autopsy surgery in *Oxendine,* supra. Although taken after removal of the body from the bathtub, State's Exhibits No. 8 and 9 more fully depict the charred condition of the body, additionally show the ring identified as belonging to the defendant upon the victim's finger, the location and extent of injury to the neck, and thereby served to further illustrate and corroborate the testimony of the investigating officer and pathologist. We, therefore, hold that these photographs were relevant to the issues before the jury, and that the probative value of these exhibits was not outweighed by the danger of prejudice to the defendant.

■ In his third assignment of error, the defendant contends that the trial court erred in permitting Ken McWethy, an agent with the United States Secret Service, to be endorsed and testify as a witness in-chief for the State. The testimony of this witness was offered to establish the purported motive for the offense, i.e., that the defendant attempted to make himself appear to be the victim of the murder and thereby avoid confinement for another offense upon which he was awaiting sentencing. This witness essentially testified that while the defendant was previously in custody on State robbery charges he pled guilty to that offense and agreed to act as an informant in return for a probationary

sentence. However, the defendant failed to provide such assistance and as a result was to receive instead a lengthy sentence of incarceration for the robbery. Attempts to locate the defendant following the murder were unsuccessful and he was not apprehended until several months later in a distant state.

Our attention is first drawn to Article II, § 20, of the Oklahoma Constitution providing in pertinent part:

" . . . in capital cases, at least two days before the case is called for trial, [the accused] shall be furnished with a list of the witnesses that will be called in chief, to prove the allegations of the indictment or information, together with their postoffice addresses."

However, in discussing this provision in paragraph 3 of the Syllabus to *Denton v. State,* 58 Okl.Cr. 275, 53 P.2d 1136 (1935), we stated:

"(b) A narrow, technical rule of construction is not applied to this provision of the Constitution. The purpose of this requirement is to enable a defendant to know what he may be expected to meet and to prepare for trial. When a defendant has this information in due time, the requirements of the Constitution have been met."

Also, in *Clark v. State,* Okl.Cr., 370 P.2d 46 (1962), we observed that the constitutional and statutory provisions regarding endorsement of witnesses do not divest the trial court of all discretion even in a capital case. Further, in *Plumlee v. State,* Okl.Cr., 361 P.2d 223, 226 (1961), which was also an appeal from a murder conviction, this Court again approved the following rule:

. " ' "The trial court in the exercise of judicial discretion may permit the name of a witness to be endorsed upon the information even after the trial has commenced. If defendant's counsel is surprised at such action and such endorsement of an additional witness requires a production of further testimony by de-

fendant, *he should withdraw his announcement of ready for trial and should file a motion for a postponement or a continuance* in which he should set out the facts constituting such surprise, and the other evidence, if any, he could produce to rebut the testimony of such additional witness if the trial of the case was continued. *Where he fails to do this the error, if any, is waived."* ' (Emphasis ours)"

However, we also there further observed that:

" 'We feel that the trial court should exercise this discretion with the utmost precaution and to ascertain within reasonable means that the county attorney is acting in good faith. This rule has not been adopted to permit the county attorney to lay behind the log and spring new witnesses on the day of trial, but to place a liberal construction upon the statutes as to meet the ends of justice. The failure to endorse witnesses before trial must be by virtue of inadvertence and in good faith, and in any event, permitted only where the defendant's rights are not prejudiced by said endorsement.' . . ."

In support of this proposition the defendant relies upon *McCollough v. State,* Okl. Cr., 360 P.2d 727 (1961) and *Harding v. State,* 95 Okl.Cr. 8, 238 P.2d 376 (1951). However, each of those cases is distinguishable in that a motion for continuance was interposed in behalf of the defendant.

In the present case, the record reveals that the defense was familiar with the testimony of the witness, that the State failed to previously endorse the witness through inadvertence and not in bad faith, and that the defendant failed to interpose a motion for continuance and was not in fact prejudiced by the belated endorsement. Sometime prior to trial this witness was examined upon the same testimony by defense counsel in other proceedings attacking the validity of the defendant's plea to the robbery charge. The defense also presented a motion in limine prior to trial to exclude

this proof of another offense, and at in camera proceedings dealing with that motion this witness again testified upon the same subject the day prior to testifying before the jury. Additionally, the defendant subpoenaed this witness to testify in his own behalf at trial. In arguing the endorsement of this witness, defense counsel admitted that the State had not acted in bad faith in stating, "Its just an oversight in their office, they didn't endorse them, but that is the way the ball bounces." (Tr. 445) Further, the defendant did not interpose an objection to the endorsement of the witness when the trial court ruled the testimony to be admissible at the in camera proceedings, and although he did object to the endorsement of the witness the following day, he did not move for a continuance claiming surprise and revealing what evidence he could produce to rebut such testimony if the trial were postponed. While the defendant did claim to have done everything he could to fulfill the agreement that he act as an informant, he in fact admitted the material portions of this witness' testimony in testifying in his own behalf, but contended that he fled because of threats upon his life from those upon whom he was to provide information. Under the circumstances of this case, we are therefore of the opinion that any error was harmless, and the trial court did not abuse its discretion in permitting the endorsement and testimony of this witness. Also see, *Schneider v. State,* Okl.Cr., 501 P.2d 868 (1972); *Wheeler v. State,* 85 Okl.Cr. 248, 187 P.2d 266 (1947), and *Smith v. State,* 69 Okl.Cr. 17, 99 P.2d 527 (1940).

■■ In the sixth assignment of error the defendant argues that the trial court erred in permitting the State to introduce evidence that he was previously charged with robbery and entered a plea of guilty to that offense. In support of this proposition the defendant cites, among other cases, *Rodgers v. State,* Okl.Cr., 427 P.2d 116, 119 (1967), wherein we again approved the following rule:

" ' . . . The general rule is that when a defendant is put upon trial for one offense he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone and the admission of evidence of other crimes, either prior or subsequent to the offense for which he is on trial is inadmissible.' "

However, there exists certain well recognized exceptions to this general rule. In the first paragraph of the Syllabus to *Moulton v. State,* Okl.Cr., 476 P.2d 366 (1970), after recognizing the general rule, this Court again stated:

" . . . However, evidence of separate and similar offenses is admissible when it is material and proper to show (1) motive, (2) intent, (3) absence of mistake or accident, (4) identity of persons charged with the commission of the crime for which an accused is put on trial, and (5) common scheme or plan embracing the two or more crimes so related to each other that proof of one tends to establish the other."

The exception that proof of a separate offense is admissible to explain the motive or intent of the accused in the commission of the offense charged is as well established as the general rule itself. See, *Dare v. State,* Okl.Cr., 378 P.2d 339 (1963); *Doser v. State,* 88 Okl.Cr. 299, 203 P.2d 451 (1949), and *Smith v. State,* 83 Okl.Cr. 209, 175 P.2d 348 (1946). The present case is analogous to *Cole v. State,* 50 Okl.Cr. 399, 298 P. 892 (1931), wherein we held that proof that the defendant was previously charged in federal court with conspiracy to violate federal prohibitory liquor laws was properly admitted to establish that the defendant's motive for the alleged murder was to eliminate the victim as a witness against him in the federal case.

In the present case, the State was permitted to introduce evidence establishing that the defendant was previously charged with robbery as well as the circumstances surrounding his entry of a plea of guilty in that case as proof of the defendant's mo-

tive for the commission of the subject offense, i. e., that the defendant perpetrated the crime in an endeavor to make himself appear to be the victim of the murder and thereby avoid imprisonment for the robbery. The theory of the prosecution was additionally supported by proof that: shortly prior to the murder the defendant declared, "If I die, don't worry because I will be back"; defendant's jewelry and personal identification were found upon the victim; an attempt was made to conceal the identity of the victim by burning the body after death; the defendant fled on the day the offense was committed. Evidence regarding the facts giving rise to the prior robbery charge was not introduced in behalf of the State. Also, immediately following admission of the testimony regarding the prior robbery charge as well as at the conclusion of the trial, the trial court properly gave the jury a cautionary instruction that such evidence could only be considered insofar as it might in their determination establish a motive for the offense alleged. We are therefore of the opinion that this assignment is without merit.

■ In his second assignment of error the defendant contends that the trial court committed error in not permitting certain expert testimony to be introduced in his behalf. This assignment is presented with regard to proffered testimony of Dr. Walter Bowlan, a licensed medical doctor with a recognized specialty in medical hypnosis. Utilizing the state of hypnosis, this witness had conducted an "interrogation-type" examination of the defendant in his jail cell on or about April 15, 1974, relative to the defendant's activities on the night of August 11 and 12, 1973. (Tr. 618–619) Although this witness was not permitted to establish the defendant's specific replies, he did testify that the detfendant's testimony at trial was similar to his statements made in hypnosis. In proceedings outside the presence of the jury, the defendant then made a seemingly two-fold offer of proof which was rejected by the trial court. First, the defendant established that, if permitted to testify, the witness would express his opinion as to whether he believed the defendant to have been telling the truth while in the state of hypnosis. Secondly, as proof of the defendant's motive in fleeing, the witness would have expressed his opinion that on the night of the offense the defendant was in mental apprehension of fear from those involved in the counterfeiting operations and not as a result of the crime. The witness admitted that while in a state of hypnosis one can lie just as when fully conscious. However, he explained that his opinion was not based solely on the defendant's replies to interrogation, but also upon such observations as the manner in which he entered the hypnotic state, as well as his demeanor and reactions and the manner and nature of his responses while in hypnosis. From such observations, the witness formed the proffered medical opinion, not as to the actual truth or falsity of the defendant's statements, but the witness' belief as to the truthfulness thereof.

Although the defendant cites numerous decisions from this jurisdiction dealing generally with the admissibility of expert testimony, the precise question of whether expert opinion is admissible in behalf of the accused as to the truthfulness of his exculpatory statements made while in a hypnotic state, presents a novel issue in this State. However, this Court has repeatedly held that the results of lie detector or truth serum tests are inadmissible for the reason that such tests have not attained sufficient scientific and psychological accuracy nor general recognition as being capable of definite and certain interpretation. See, *Henderson v. State,* 94 Okl.Cr. 45, 230 P.2d 495, 23 A.L.R.2d 1292 (1951); *Leeks v. State,* 95 Okl.Cr. 326, 245 P.2d 764 (1952); *Hayes v. State,* Okl.Cr., 292 P.2d 442 (1956); *Looper v. State,* Okl.Cr., 381 P.2d 1018 (1963); *Mullins v. Page,* Okl.Cr., 443 P.2d 773 (1968); *Vetter v. State,* Okl.Cr., 506 P.2d 1400 (1973); *Cherry v. State,* Okl.Cr., 518 P.2d 324

(1974), and *Fulton v. State,* Okl.Cr., 541 P.2d 871 (1975).

Recognizing that hypnosis involves the same scientific principles involved in truth serum tests, this rationale is further extended to test results based upon the use of hypnosis in 3 Wharton's Criminal Evidence, § 630 (13th ed. 1972), wherein the author states:

"The results of using a lie detector, truth serum, or hypnosis, when offered in evidence for the purpose of establishing the guilt or innocence of an accused, are not admissible—the most commonly assigned reason being that such a testing device has not yet attained scientific recognition as a sufficiently reliable and accurate method of determining truth or falsity. . . ." (Footnotes omitted)

Also see, *People v. Ebanks,* 117 Cal. 652, 49 P. 1049 (1897); *State v. Pusch,* 77 N.D. 860, 46 N.W.2d 508 (1950); *People v. Busch,* 56 Cal.2d 868, 16 Cal.Rptr. 898, 366 P.2d 314 (1961); Annot., 23 A.L.R.2d 1306, Physiological or Psychological Truth and Deception Tests; 29 Am.Jur.2d, Evidence, § 831; 3A Wigmore on Evidence, § 998, page 943, footnote 5 (Chadbourn rev. 1970). Further, in the annotation appearing at 41 A.L.R.3rd 1369, "Admissibility of Physiological or Psychological Truth and Deception Tests or its Results to Support Physician's Testimony." the following appears:

"No completely reliable physiological or psychological truth and deception test presently exists. . . . [T]he injection of a 'truth serum' and the use of hypnosis tend to deprive a subject of his self-control and willpower and inhibit his ability to construct barriers to telling the truth; but it is also known that they sometimes induce subjects to engage in fanciful or exaggerated versions of what the subject may incorrectly feel to be the truth. Therefore, it cannot be said that any of these tests unerringly and automatically require a subject to state only the exact truth." (At page 1373, footnotes omitted)

"As a general proposition the admissibility of the results of, or recordings of, physiological or psychological truth and deception tests has been almost universally rejected by the courts when offered for establishing the truth of the statements made while under their influence . . . ." (at page 1372, footnote 11)

Insofar as the defendant here sought to introduce his statements while in hypnosis and expert testimony based upon such examination for the purpose of establishing the truth of those declarations, we are therefore of the clear opinion that the trial court properly rejected the offer of proof.

■ In support of defendant's proposition that the trial court erred in excluding expert opinion testimony upon his state of mind, he cites *People v. Modesto,* 59 Cal.2d 722, 31 Cal.Rptr. 225, 382 P.2d 33 (1963), where in that murder prosecution the defendant admitted the slayings but was seemingly unaware of his reason or intent in committing them. In behalf of the defense, evidence was introduced that the defendant was intoxicated when the killings occurred, and a psychiatrist diagnosed the defendant as exhibiting an abnormal behavioral pattern and as possibly suffering from organic brain disease of undetermined cause. The trial court permitted the psychiatrist to express an opinion upon the accused's state of mind and intent when the offense was committed based in part upon hypnotic examinations. That case does not reveal when after the commission of the offense the defendant was psychiatrically examined, but does indicate that several interviews were conducted incident to a psychiatric diagnosis and evaluation utilizing tests other than hypnotic examination. In holding that under such evidence the trial court erred in failing to instruct upon the lesser included offense of manslaughter and approving the admission of expert opinion testimony upon state of mind, the court there stated:

"[P]sychiatric testimony that negates the specific mental state essential to a particular crime is relevant and admissible

as a 'partial defense.' '. . . it appears only fair and reasonable that defendant should be allowed to show that in fact, subjectively, he did not possess the mental state or states in issue.' . . ." (31 Cal.Rptr. 230, 382 P.2d 38)

In the present case, expert testimony upon the defendant's state of mind was not offered to establish a lack of the requisite intent to constitute the offense, but for the wholly unrelated purpose of bolstering the defendant's testimony that when the offense occurred he was fleeing in fear of threats upon his life by others.

Assuming expert testimony upon the defendant's state of mind at the time of the crime to be otherwise admissible, we are of the opinion that in the present case the trial court properly rejected such proof. This is for the reason that the defendant failed to establish an adequate and proper foundation for such testimony and the proffered opinion rested wholly or essentially upon a legally incompetent basis. We recognize that truth serum or hypnosis may be employed as an accepted analytical tool in psychological or psychiatric evaluation and diagnosis. See, *Brown v. State,* Okl.Cr., 304 P.2d 361 (1956). However, here only one interview was conducted some eight months after the commission of the crime, with no empirical showing of reliability. The witness' opinion was based upon the defendant's responses in hypnosis together with his observation of the nature and manner of the defendant's reactions incident thereto. As presented to the trial court, the proffered expert testimony upon the defendant's state of mind was equivalent to an offer to relate the defendant's exculpatory declarations while in hypnosis together with the witness' opinion of the defendant's truthfulness in making those assertions. The validity of this facet of the defendant's offer of proof necessarily rested wholly upon the reliability of the hypnotic examination and was therefore as equally objectionable as the proof first offered. Absent a proper foundation and legally competent basis for such expert opinion testimony, the admission thereof would have been tantamount to the introduction of self-serving hearsay declarations.

Additionally, however, in *McKee v. State,* Okl.Cr., 372 P.2d 243 (1962), this Court held that the trial court properly rejected defendant's offer of expert testimony that she was motivated by mental apprehension of fear in slaying her husband. In the first paragraph of the Syllabus to that decision, we stated:

"The state of mind of the accused is the proper subject for expert testimony when the defense is based on a plea of insanity at the time of commission of the act, but it is not a proper subject for expert testimony when the defense is not based on a plea of insanity at the time of commission of the act for which the defendant stands accused."

In so holding, we further reasoned that:

"To allow a psychiatrist to testify on the basis of examinations made more than thirty days after the slaying as to whether or not the accused acted in necessary self defense, on the basis of facts existing at the time of the slaying, would clearly sanction an invasion of this exclusive province of the jury." (at page 246)

In *Carter v. State,* Okl.Cr., 376 P.2d 351 (1962), we distinguished that decision in holding that competent and relevant expert testimony bearing upon the state of defendant's consciousness at the time of the alleged crime should be admitted when the defendant interposes the defense of unconsciousness pursuant to 21 O.S.1971, § 152, ¶ 6, but that case has no applicability here. We, therefore, hold that this proposition too is without merit.

In defendant's remaining assignment of error, which is presented in his brief as his first assignment, he attacks the constitutionality and applicability of the statute under which he was convicted and the death

sentence imposed. This proposition is, in part, premised upon Article V, § 57, of the Oklahoma Constitution which provides:

> "*Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title,* except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes; *and no law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended, extended, or conferred shall be re-enacted and published at length:* Provided, That if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to so much of the law as may not be expressed in the title thereof." (Emphasis added)

Those propositions premised upon this provision present questions to be resolved solely upon the basis of State constitutional interpretation and construction as no federal question is involved. Both this Court and, more frequently, the Supreme Court of this State have previously been called upon to construe this provision, and our application thereof should be consonant with our sister court in favor of a uniform interpretation of such State constitutional provisions. We have therefore carefully examined the decisions of the Supreme Court of this State in the resolution of all propositions based upon this provision.

The defendant was here convicted under 21 O.S.Supp.1974, § 701.1, ¶ 9, enacted by H.B. 1101, Okl.Sess.Laws 1973, Ch. 167, effective May 17, 1973, the title and body of which bill provide in pertinent part as follows:

> "AN ACT RELATING TO CRIMES AND PUNISHMENTS; DEFINING MURDER IN THE FIRST DEGREE; DEFINING MURDER IN THE SECOND DEGREE; PROVIDING FOR THE MANDATORY DEATH PENALTY FOR MURDER IN THE FIRST DEGREE; PROVIDING PUNISHMENT FOR MURDER IN THE SECOND DEGREE; PROVIDING FOR REVIEW OF SENTENCE OF DEATH AND EVIDENTIARY HEARING RELATING THERETO BY COURT OF CRIMINAL APPEALS; PROVIDING FOR MODIFICATION OF SENTENCE OF DEATH BY COURT OF CRIMINAL APPEALS IN CERTAIN CASES; REPEALING 21 O.S.1971, §§ 701 AND 707; DIRECTING CODIFICATION; PROVIDING FOR SEVERABILITY; AND DECLARING AN EMERGENCY.

> "*Be it enacted by the People of the State of Oklahoma:*

> "SECTION 1. Murder in the first degree

> "Homicide, when perpetrated without authority of law and with a premeditated design to effect the death of the person killed, or of any other human being, is murder in the first degree in the following cases:

> "1. When perpetrated against any peace officer, prosecuting attorney, corrections employee or fireman while engaged in the performance of his official duties;

> "2. When perpetrated by one committing or attempting to commit rape, kidnapping for the purpose of extortion, arson in the first degree, armed robbery or when death occurs following the sexual molestation of a child under the age of sixteen (16) years;

> "3. When perpetrated against any witness subpoenaed to testify at any preliminary hearing, trial or grand jury proceeding against the defendant who kills or procures the killing of the witness, or when perpetrated against any human being while intending to kill such witness;

> "4. When perpetrated against the President or Vice President of the United States of America, any official in the line of succession to the Presidency of the United States of America, the Governor or Lieutenant Governor of this

state, a judge of any appellate court or court of record of this state, or any person actively engaged in a campaign for the office of the Presidency or Vice Presidency of the United States of America;

"5. When perpetrated by any person engaged in the pirating of an aircraft, train, bus or other commercial vehicle for hire which regularly transports passengers;

"6. When perpetrated by a person who effects the death of a human being in exchange for money or any other thing of value, or by the person procuring the killing;

"7. Murder by a person under a sentence of life imprisonment in the penitentiary;

"8. When perpetrated against two or more persons arising out of the same transaction or occurrence or series of events closely related in time and location;

"9. When perpetrated against a child while in violation of Section 843, Title 21 of the Oklahoma Statutes; and

"10. Intentional murder by the unlawful and malicious use of a bomb or of any similar explosive."

Title 21 O.S.1971, § 843, enacted by H.B. 781, Okl.Sess.Laws 1963, Ch. 53, § 1, provides:

"Any parent or other person who shall willfully or maliciously beat or injure, torture, maim, or use unreasonable force upon a child under the age of seventeen (17), or who shall cause, procure or permit any of said acts to be done, shall be punished by imprisonment in the state penitentiary not exceeding five years, or by imprisonment in a county jail not exceeding one year, or by a fine of not more than Five Hundred Dollars ($500.-00), or both such fine and imprisonment."

 Defendant argues that the reference to 21 O.S.1971, § 843, fails to meet the requirement of re-enactment and publication at length set forth in Article V, §

57, of the Oklahoma Constitution. We first observe that such legislation is known as a reference statute, i. e., an enactment which refers to and by reference adopts wholly or partially pre-existing statutes, and is recognized as a familiar and valid mode of legislation where not otherwise constitutionally objectionable. See, *State v. Sheldon*, 96 Okl.Cr. 38, 247 P.2d 975 (1952). In discussing this aspect of our State constitution in the case of *In re Lee*, 64 Okl. 310, 168 P. 53, 57 (1917), the Supreme Court stated:

"Constitutional prohibitions of the character here involved have often been discussed by the courts, and it appears:

"That they 'have never, in construction, been given a rigid effect, but have been held applicable only to such statutes as come within their terms, when construed according to the spirit of such restriction, and in the light of the evils to be suppressed.' 36 Cyc. 1061."

The decisions from this State dealing with this phase of Article V, § 57, of the Oklahoma Constitution, are analyzed in 82 C.J.S. Statutes § 72, page 130, in part as follows:

"*In Oklahoma*, . . ., it is held that the inhibition of the provision is one against extending the provisions of an act by a reference only to the title of the act, and where an act is original and complete in itself and the privileges intended to be conferred are clear, or where the act does not on its face purport to do any of the things prohibited by the constitution, it is valid. . . . A reference to existing laws by number for the purpose of making them applicable, without mention of the title of the laws referred to, does not render an act invalid under the restriction." (Footnotes omitted)

Thus, the Supreme Court reasoned in *State ex rel. Breene v. Howard*, 67 Okl. 289, 171 P. 30, 33 (1918), that:

"The provision of the Constitution relied upon was intended to prevent the mischief which arose by the enactment of

amendatory statutes so blind in terms that the legislators themselves were sometimes deceived in regard to their effect, and the public, from the difficulty in making the necessary examination and comparison, failed to become apprised of the changes made in the laws by the enactment of such legislation. A familiar illustration was the passage of an act amending a prior act which purported only to insert certain words, or to substitute a phrase of another by referring thereto without re-enacting the section affected. *Such constitutional provisions have always received a liberal construction with the view of preventing the evil at which they were aimed, but when the statute in itself appears to be original, and in itself intelligible and complete, and does not either in its title or in the body thereof appear to be revisory or amendatory of any law, it is not within the inhibition of section 57, art. 5,* even though such act seeks to effectuate the power conferred by referring to, and requiring, the officers thereby created to proceed in the performance of their duties in accordance with the general laws previously enacted. *City of Pond Creek v. Haskell,* 21 Okl. 711, 97 P. 338; No. 9182, *In re Application of Iohn W. Lee,* [64 Okl. 310], 168 P. 53; 1 Lewis' Sutherland, Stat.Const. § 243." (Emphasis added)

Further, in *Edmonds v. Town of Haskell,* 121 Okl. 18, 247 P. 15, 17 (1926), dismissed for want of jurisdiction, 273 U.S. 647, 47 S.Ct. 246, 71 L.Ed. 821 (1926), the Oklahoma Supreme Court held that the statute which referred to an earlier enactment by citation to its article and chapter number in the revised laws without reference to the title of the prior law did not violate this constitutional provision, and in so holding stated in part that:

"[T]he only express limitation in such provision is that no law shall be extended, etc., by reference to its title only; that is, by only referring to its title. *The limitation goes no further than merely to prohibit the extension, etc., of a statute by reference to its title only; that is, by reference only to its title.* The act in question makes no reference whatever to the title of the act which it puts in force. It is clear, from both the title and the provisions of said chapter 176, that the Legislature did not intend nor attempt to extend the provisions of article 12, chap. 10, R. L. 1910 (now article 12, chap. 29, C. S. 1921), ·by reference to its title only, and does not refer to the title at all. . . . " (Emphasis added)

Also see, *Bocox v. Town of Bixby,* 114 Okl. 269, 247 P. 20 (1926).

▋ Close examination and analysis of § 1, of H.B. 1101, discloses that ¶ 9 accomplishes by subject reference and specific code citation the same object accomplished in ¶ 2 thereof by descriptive word reference. Nowhere in the act is there any reference to the title of· H.B. 781 as previously enacted. Just as ¶ 2, by descriptive words, refers to 21 O.S.1971, § 1111, defining rape, 21 O.S.1971, § 745, defining kidnapping for the purpose of extortion, 21 O.S.1971, § 1401, defining arson in the first degree, and 21 O.S.1971, § 791, defining robbery, ¶ 9 explicitly refers to 21 O.S.1971, § 843, by citation and reference· to the subject thereof, i. e., children. Of necessity, this principle of incorporation by reference is in an even more generalized fashion employed in 21 O.S.1971, § 711, ¶ 1, defining "misdemeanor-manslaughter" as a homicide perpetrated "by a person while engaged in the commission of *a misdemeanor,"* and was previously employed in 21 O.S.1971, § 701, ¶ 3, repealed by the subject act and re-enacted in ¶ 3 of § 2 thereof with necessary modification, in defining "felony-murder" as a homicide perpetrated "by a person engaged in the commission of *any felony."* A careful reading of the act reveals that neither the title nor the body thereof purport ïn any manner to be revisory or amendatory of 21 O.S.1971, § 843, neither are the provisions of the earlier enactment

extended or conferred thereby. Rather, the prior statute is left undisturbed, and in defining a new crime the subject act simply refers thereto for a description of one of the ten enumerated classes of persons who are guilty of first degree murder when perpetrating a homicide "without authority of law" and "with a premeditated design." As the act is in this regard without any amendatory character, there is no infringement of the mischief sought to be cured by the constitutional provision. We do not view this aspect of the statute as failing to provide adequate notice of the acts prohibited thereby for this would require an assumption that one is ignorant of the acts prohibited under the previously enacted statute. Although perhaps inaptly drawn, for the above and foregoing reasons we are of the opinion that in defining a new crime the statute is original and complete and not within the constitutional inhibition. We are fortified in this regard by the principle of law universally recognized that no legislative act should be stricken as unconstitutional except where repugnancy to the Constitution is shown beyond a reasonable doubt. See, *City of Pond Creek v. Haskell,* 21 Okl. 711, 97 P. 338 (1908), containing an expanded discussion of this section of the Oklahoma Constitution.

 In this regard the defendant further argues that 21 O.S.Supp.1974, § 701.1, ¶ 9, incorporates by reference the entire provisions of 21 O.S.1971, § 843, and is thereby rendered ambiguous since two punishment provisions for the same offense are delineated. However, this argument is patently frivolous for by its express terms ¶ 9 only incorporates so much of the prior statute as defines an offense thereunder and not that portion setting forth the punishment for a violation thereof.

 Defendant also asserts that the title of the subject act fails to meet the requirement of Article V, § 57, of the Oklahoma Constitution that every act of the Legislature shall embrace but one subject which shall be clearly expressed in its title.

This proposition is seemingly based upon the absence of an actual definition of first degree murder within the title and the failure of the title to reflect a purported modification of 21 O.S.1971, § 843. However, we have already held that the act was in no manner amendatory of the earlier statute. In numerous cases the courts of this State have held that the purpose of this constitutional provision is to prevent the blending of repugnant objects in one act and the inclusion of provisions not indicated by the title in order that those interested may not be misled or misinformed as to the contents of the statute. See, *School Dist. No. 25 of Woods County v. Hodge,* 199 Okl. 81, 183 P.2d 575 (1947), and *Stewart v. Oklahoma Tax Commission,* 196 Okl. 675, 168 P.2d 125 (1946). Additionally, it has been repeatedly held that this section is not to be construed in such a manner as to hamper or unreasonably restrict the Legislature in the performance of its duty. See, *Lowden v. Washita County Excise Board,* 188 Okl. 698, 113 P.2d 370 (1941), and *Ex parte Lee,* 88 Okl.Cr. 386, 203 P.2d 720 (1949). It has repeatedly been held that this section is general and comprehensive in nature and where the body of the act is germane, relative and cognate to the title of the act, it is sufficient to meet the requirements of the constitution. See, *Rumsey v. Diamond,* 127 Okl. 72, 259 P. 849 (1927) and *Leathcrock v. Lawter,* 45 Okl. 715, 147 P. 324 (1915). Also, if the clauses of the statute are referable and cognate to the subject expressed in the title, the title need not set out each clause of the act. See, *Jungels v. Town of Hennessey,* 202 Okl. 619, 217 P.2d 167 (1950) and *Jackson v. State,* 22 Okl. Cr. 338, 211 P. 1066 (1923). Neither need the title of a statute embrace an abstract of its contents when the title otherwise fairly indicates the general purpose of the statute. See, *State ex rel. Fulton v. State Election Board,* 168 Okl. 446, 33 P.2d 800 (1934), and *Brooks v. State,* 152 Okl. 119, 3 P.2d 814 (1931). In the present case, the title specifically re-

veals that murder in the first degree is defined within the body of the act, and there is no necessity that the definition set forth in each clause of Section 1 be set forth within the title. Applying these principles to the subject act, we find the body of the act to be germane, relative and cognate to the title, and defendant's interpretation thereof to be inconsistent with the purposes of that constitutional provision.

Defendant further argues that 21 O.S. 1971, § 843, supra, only applies to an accused who is the parent, guardian or one in loco parentis to the child victim. As previously observed, that statute was enacted by H.B. 781, Okl.Sess.Laws 1963, Ch. 53, along with 21 O.S.1971, § 844. This proposition is in part based upon the phraseology employed within the title to that bill and the provisions of the latter statute, which are respectively as follows:

> "An Act relating to crimes and punishments; providing for a fine and/or imprisonment of any parent or other who shall willfully or maliciously beat or injure, torture, maim, or use unreasonable force, going beyond that which is necessary for the purpose of discipline and control; prescribing the circumstances to be considered; and declaring an emergency.
>
> \* \* \* \* \* \*
>
> "Provided, however, that nothing contained in this Act shall prohibit any parent, teacher or other person from using ordinary force as a means of discipline, including but not limited to spanking, switching or paddling."

Defendant argues that the phrase, "any parent or other," as used within the title to that enactment should be viewed as a limiation upon the language, "any parent or other *person*," employed within the body of 21 O.S.1971, § 843. He further asserts that applying the rule of ejusdem generis to the phrase, "any parent, teacher or other person," as contained in 21 O.S.1971, § 844, necessitates the conclusion that the Legislature intended for that bill to only apply to an accused who is the parent, guardian, or one in loco parentis, to the child victim.

We would agree that the exclusionary provisions of 21 O.S.1971, § 844, are indicative of a Legislative intent that only those lawfully entitled to use force as a means of discipline may avail themselves thereof. However, we cannot agree that the exclusion contained within that provision operates to otherwise limit the preceding section in defining and delineating the crime. We have already observed that the title to an enactment may be very general and need not set out each clause of the act, if the clauses of the statute are referable and cognate to the subject expressed in the title. We therefore do not agree that the use of the language, "any parent or other," in the title of the act, operates to limit the phrase, "any parent or other person," as used within 21 O.S.1971, § 843. We are of the opinion that the interpretation now urged upon us would unduly restrict the operation of the language, "or other person," as contained in the last mentioned statute. If the Legislature had intended to so restrict that statute, we are persuaded ·that express terms of limitation would have been employed, and that the statute expressly extends to parents in emphasis of its applicability to those who exceed the use of lawful force upon a child. A statute must be held to mean what it plainly expresses and no room is left for construction and interpretation where the language employed is clear and unambiguous. See, *King v. State,* Okl.Cr., 270 P.2d 370 (1954) and *McVicker v. Board of County Com'rs of Co. of Caddo,* Okl., 442 P.2d 297 (1968). We therefore hold this proposition too to be without merit.

Finally, the defendant contends that the death sentence is unconstitutional by virtue of the decision of the United States Supreme Court in the consolidated cases of *Furman v. Georgia, Jackson v. Georgia,* and *Branch v. Texas,* 408 U.S. 238, 92 S.Ct. 2726, 32 L.Ed.2d 346 (1972). However, we need here only observe that

this contention was recently thoroughly analyzed and rejected by this Court in the consolidated opinion of *Williams and Justus v. State,* Okl.Cr., 542 P.2d 598 (1975), wherein we held in part as follows:

"[T]he scheme for enforcement of capital punishment within this State under the provisions of 21 O.S.Supp.1974, § 701.1, et seq., as construed, does not constitute cruel and unusual punishment and is not violative of the Eighth and Fourteenth Amendments to the United States Constitution as interpreted by the United States Supreme Court in *Furman.*"

 As this is the first decision of this Court to discuss the constitutionality of a conviction under 21 O.S.Supp.1974, § 701.1, ¶ 9, we are constrained to address the reasonableness of the classification thereunder though not raised by the defendant. In *Williams and Justus,* supra, this Court held that the classification of homicide perpetrated incident to armed robbery as first degree murder under the provisions of ¶ 2 of that statute constituted a legitimate and reasonable exercise of police power by the Legislature. We there recognized that offense to be of an intrinsically distinguishable quality, and rejected the contention that such a classification was arbitrary and discriminatory in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution. The welfare of children generally and the child-beating syndrome have been matters of grave public concern, and each branch of government has recognized that children require a greater degree of care and protection. Title 10 of the Oklahoma Statutes was enacted and has been construed and applied to foster the care and protection of children. The imposition of mandatory capital punishment for such an offense serves to deter with the death penalty particularly heinous and brutal offenses against relatively defenseless children. Contrary to being an arbitrary or discriminatory classification, we are persuaded that such an offense is of an intrinsically distinguishable quality adopted for the protec-

tion of a viable class capable of distinction. Upon the rationale and authority more fully discussed in *Williams and Justus,* we therefore hold that this classification constitutes a legitimate and reasonable exercise of police power by the Legislature.

Pursuant to Rule 1.11, 22 O.S.Supp.1974, Ch. 18, App., this case was previously assigned and heard for oral argument. We have carefully reviewed the entire record before this Court, and thoroughly considered the argument and authority presented and have determined that the record is free of any error of law requiring reversal. The judgment and sentence is, accordingly, *affirmed.*

Pursuant to Rule 1.18, 22 O.S.Supp.1974, Ch. 18, App., the defendant is advised that any Petition for Rehearing herein, must be filed with the Clerk of this Court within fifteen (15) days of the date upon which this opinion is filed therein.

BRETT, P. J., and BLISS, J., concur.

## ORDER DENYING PETITION FOR REHEARING

Appellant was heretofore sentenced to suffer death for the offense of First Degree Murder in violation of 21 O.S.Supp. 1974, § 701.1, ¶ 9, in Case No. CRF–73–2221 of the District Court, Oklahoma County, and upon appeal that sentence was thereafter affirmed by the Opinion of this Court rendered in the above entitled cause on November 14, 1975.

 Upon Petition for Rehearing, Appellant concedes that evidence introduced by the State was sufficient to establish a premeditated murder of the child victim by strangulation, but contends that the homicide was not perpetrated while in violation of 21 O.S.1971, § 843, as required under the aforesaid statute. The argument is seemingly that the latter statute prohibits child abuse only and does not encompass an intentional strangulation. In our previous opinion we rejected the contention that this statute applies only to an accused who is the parent, guardian or one in loco

parentis to the child victim. The proof introduced by the State established that death was caused by intentional strangulation following blunt force trauma to the head sufficient to cause brain injury. Premeditated design is an element common to all cases of First Degree Murder. The latter statute prohibits the willfull or malicious injury of a child and this would clearly include strangulation. We are therefore of the opinion that this proposition is wholly without merit and Appellant's Petition for Rehearing is hereby denied.

It is therefore ordered, adjudged and decreed that the Order of this Court staying execution of sentence herein pending appeal be dissolved and the Clerk of this Court is directed to issue Mandate forthwith.

It is further ordered, adjudged and decreed that the judgment and sentence herein appealed from be carried out by the electrocution of the Appellant, Ben Wiley Jones, Jr., by the Warden of the State Penitentiary at McAlester, Oklahoma, on Wednesday, March 3, 1976.