Frederick Hamilton **WISHON, Appellant,**

v.

The **STATE of Oklahoma, Appellee.**

No. F–75–360.

Court of Criminal Appeals of Oklahoma.

May 24, 1976.

Rehearing Denied June 10, 1976.

Don Anderson, Public Defender, Oklahoma County, for appellant.

Larry Derryberry, Atty. Gen., James Swartz, Asst. Atty. Gen., Harold T. Garvin, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Frederick Hamilton Wishon, hereinafter referred to as defendant, along with Sammy Duane Williams, was jointly charged and tried in the District Court, Oklahoma County, Case No. CRF–74–912, for the offense of First Degree Murder, in violation of 21 O.S.Supp.1973, § 701.1, ¶ 9. The jury found the defendant guilty as charged but acquitted his co-defendant. In accordance with the provisions of 21 O.S.Supp.1973, § 701.3, the defendant was thereafter sentenced to suffer death, and from said judgment and sentence a timely appeal has been perfected to this Court.

At the trial evidence introduced in chief by the State established that Sammy Duane Williams contacted Sergeant Raymond Page at the Edmond Police Department on the morning of January 13, 1974, and informed him that the defendant had killed Tommy Lee Mantooth the previous night. Williams then directed officers to a vacant field located southeast of the intersection of Hawthorne Place and Red Oak Terrace in Edmond, Oklahoma County, Oklahoma, where the body of the 13-year-old victim was discovered in a complete state of rigor mortis with a very large and deep laceration type wound of the neck which would have produced death within a few minutes. Investigation revealed three sets of footprints entering the field from Red Oak Terrace and proceeding to the area of an underground utility box. Blood spots first appeared at that location and then trailed 96 feet to where the body was found lying face down. Only two sets of footprints then led from the area of the utility box to the body and returned to the road. The two sets of footprints then re-entered the field and led to the body before again returning to the road.

Autopsy established that death was caused by a large incised wound of the throat and neck which had been cut more than once. The wound was seven inches in length from the front of the throat around the right side of the neck and gaped open three and one-half to four inches wide. The wound extended back almost to the spine with the trachea, or windpipe, being cut completely in half and only a small bit of tissue was not severed at the back of the esophagus, the tube through which food passes. Although the wound extended around only somewhat more than half of the circumference of the neck, of all the major arteries and veins connecting the head and body only one major artery and the spinal cord with its enclosing bond were left functionally intact. The

brain and major organs of the body were relatively bloodless with very small amounts of blood and clotted material in the airways of the lungs. Additionally, the very tip of the right middle finger had recently been amputated.

The defendant was arrested at about noon of the same day on which the victim was discovered, and his parents as well as the mother and stepfather of Williams were summoned to the Edmond police station, since both the defendant and Williams were then 17 years of age. Williams was at this time, however, regarded as only a material witness and was not under arrest. The defendant and his parents agreed to questioning after they had been advised of the charge and the defendant's rights. Under interrogation by Lieutenant Don Faulkner the defendant gave two somewhat inconsistent oral statements in which he did not directly incriminate either himself or Williams. Williams and his parents were then called into the defendant's presence, and Williams was asked to repeat the information that he had provided earlier. Williams made a statement tending to incriminate the defendant as the sole perpetrator of the offense, and then left the room with his parents. Lieutenant Faulkner questioned the defendant's previous statement but the defendant continued to deny any involvement in the commission of the offense. While the defendant was then being returned to his cell, he stated that he would like to tell what had happened if his mother would leave the room. The defendant's mother agreed to do so when Lieutenant Faulkner brought the defendant back into the room with his parents and explained the defendant's request. The defendant then gave a third oral statement in the presence of his father, in which he confessed to the commission of the offense but also inculpated Williams as an accomplice. Williams and his parents were recalled into the room and the defendant repeated his last statement. Williams was then advised of his rights in the presence of his parents and made an-

other oral statement which was not mutually compatible with that of the defendant, but in which he did both inculpate and exculpate himself as an accomplice to the offense. Both the defendant and Williams then executed written statements which were also admitted into evidence. Williams was arrested for first degree murder and his mother was arrested as a material witness.

Considering the defendant's written statement and final oral statement together, he stated that he first came in contact with Williams the previous evening when Williams came to his house and asked that the defendant take him to do his laundry and to buy some groceries. The defendant and Williams lived in homes directly behind each other. They later returned to Williams' home where the latter took a bath, and defendant then told Williams that he intended to kill the victim and Williams agreed to assist the defendant. They subsequently proceeded to an amusement center where Williams lured the victim with them under the pretext of going to the country to smoke some marihuana. The three then drove to the scene of the crime where the defendant told the victim that he had hidden some marihuana near the utility box, but there was no marihuana there and Williams knew so. While the victim was looking about the ground, the defendant sneaked upon him, reached around and cut his throat, and the victim ran and fell. The defendant and Williams then returned to the car, but Williams told the defendant that he should make certain the victim was dead or he would be in a lot of trouble. They both then returned to the body and the defendant again ran the knife through the victim's throat. They then drove to the restroom facility of a cafe and the defendant washed blood off himself and the knife. They then proceeded to Williams' residence where they told Williams' mother what they had done, and she helped wash blood from the defendant's clothing and boots. The defendant then returned

to his home and watched television before later going to bed. The weapon was described as a stalliano hunting knife and the defendant said it could be found above the door frame in the closet to his bedroom.

The defendant further stated that he killed the victim because he had raped his girlfriend about one year prior thereto. He stated that he learned of the assault upon his girlfriend from her on the night of the offense, but also stated that he had previously learned of the incident from some boys. While driving to the crime scene with the victim, the defendant stated that he asked him "if he ever got to her" and the victim replied that he had raped the defendant's girlfriend while she was asleep. (TR 693) Testimony of the victim's mother established that the defendant's girlfriend had spent the night with the victim's sister at his home in 1973.

In his final oral statement and written statement, Williams acknowledged that while at his residence the previous evening the defendant told him he was going to kill the victim, but maintained that he did not believe the defendant actually intended to do so and thought that he was only kidding. He also admitted that they went to the amusement center to get the victim to go with them but stated that they did so together. At the amusement center he told the victim they were going to smoke some marihuana knowing that there was none. After the defendant cut the victim's throat at the crime scene, the victim fell to the ground and started crawling and kicking. When asked how the victim got 96 feet from the point of the assault, Williams denied that they had carried him and stated that the victim had gotten there on his own and had wiggled part of that distance. Williams denied that he had said anything to encourage the defendant to cut the victim a second time, and asserted that after the first assault he suggested that the victim needed help and that perhaps they should take him to a hospital. Upon leaving the crime scene Williams related that the de-fendant told him to drive the car. When they later returned to his home, Williams stated that they only told his mother they had been in a fight.

In comparison with plaster cast impressions of the two sets of footprints found near where the body was discovered, officers determined that the footprints were made with boots and shoes taken from the defendant and Williams after their arrest. A shirt and pair of jeans which the defendant also admitted wearing at the time of the offense were seized after his arrest. Acting under authority of search warrant waivers, stained undershorts were found in a trash box in the kitchen of Williams' residence, and a jacket which the defendant admitted to have worn the previous night as well as the knife previously described were discovered at his residence. The knife was a stag handled hang knife with a blade about five and one-quarter inches long and overall length of approximately nine and one-half inches. Laboratory analysis established that the undershorts and shirt were positive for blood stains, and the jeans, jacket and knife were positive for human blood stains.

In his own defense the defendant testified that on the night of January 12, 1974, his girlfriend told him that she had previously been raped by the victim. Admitting to using narcotics, he testified that learning of the assault upon his girlfriend led to his taking three "hits" of LSD and he also drank beer and whiskey. (TR 807) As a result he became drunk and suffered hallucinations and had no recollection of the events surrounding the actual commission of the offense. He testified that he did not intend to kill the victim but admitted that he did not know whether he had done so. He explained that he confessed to the murder only because the officers and Williams kept telling him that he had killed the victim and he was afraid that the incident might have happened as they claimed. He also asserted that the officers had told him what to say in his written statement.

Defendant further testified that he recalled returning to Williams' house while Williams was bathing but did not remember whether he talked with Williams about killing the victim. They then left Williams' residence and went riding around to several places looking for the victim. He wanted to talk with the victim but was not acquainted with him and would not have recognized the victim. He remembered going to the amusement center but could not recall going inside. He next remembered the victim being in the car he was driving and the victim telling him that he had raped defendant's girlfriend. The victim at that time related to defendant that he had waited until defendant's girlfriend was asleep and "got on her." (TR 811) The defendant explained that he usually kept marihuana in the field at the crime scene but did not then remember if he had any hidden there. He recalled discussing marihuana while the three of them were riding around in his car, but did not remember going to the crime scene although he did recall leaving that location with Williams driving. He could not remember then having any conversation with Williams but acknowledged that he had previously stated that Williams told him to go back and cut the victim again. The defendant next remembered being at Williams' residence. He then returned home where he watched television and later went to bed but could not sleep due to the influence of the drugs. He identified the knife introduced by the State as the one he had owned for about three or four years, and acknowledged that he carried the knife on his belt most of the time.

Williams then presented testimony in his defense which differed in certain material respects from evidence previously introduced. He acknowledged that while they were at his residence on the night of the offense the defendant told him he was going to kill the victim, but again maintained that he did not believe the defendant and thought he was only mad about something. The defendant was described as acting very peculiar. When they left his residence, he testified that they were not looking for anybody and went riding around before going to the amusement center. Although he admitted knowing that the victim frequented the amusement center, he and the defendant had only discussed going to "party a little bit and smoke a little marihuana." (TR 853) He had previously smoked marihuana with the defendant and also the victim, and thought that some marihuana was buried near the utility box at the crime scene. He previously told the police that he knew there was not any marihuana because he did not want to be arrested for that offense. At the amusement center he played various games for about 45 minutes. Although he did not know how they had gotten together, he then observed the defendant and the victim walking toward the door and the defendant motioned for him to come with them. In the defendant's presence he told the victim that he and the defendant were going to smoke marihuana and thought the victim also had some marihuana. The three of them then left the amusement center and went riding around before going to the scene of the crime. While searching for the marihuana in the area of the utility box, he heard the victim try to yell. He then looked up and saw the defendant reach around from behind the victim and cut his throat with the knife in defendant's right hand and his left hand across the victim's face. The victim then began grabbing at his throat and ran before falling to the ground and wiggling around. Momentarily, Williams suggested that they take the victim to the hospital but the defendant said nothing and just looked at the victim. They returned to the car and the defendant told him to drive to a local cafe, but the defendant then got out of the car and Williams followed him to the body not knowing what the defendant intended. The defendant then bent over the body but Williams only assumed that he again cut the victim's throat and did not actually see him do so. As they were again returning

to the car the defendant laughed and told Williams that he hoped he would not tell anyone because he would then have to cut him too. Williams then drove to the outdoor restroom facility at a cafe where defendant washed blood off himself and the knife. Williams wanted to get away but the defendant told him to come in with him and he was afraid. The defendant then drove to Williams' residence. When Williams' mother awoke and asked the defendant how he had gotten so much blood on him the defendant told her that he had been in a fight. The defendant drank some more beer and before leaving to go home again told Williams not to tell anyone. Williams then wanted to leave but was afraid to do so and spent the rest of the night at his back door watching to see if the defendant came out of his house. When his stepfather returned home the next morning Williams tried to talk to him about the incident but he did not want to get involved. Later that morning he ran nine blocks to the police station where he asked to talk with Sergeant Page. After the defendant was arrested, Williams asked Sergeant Page if he should get a lawyer and Sergeant Page replied that he thought Williams would only be involved as a witness. He acknowledged signing some papers at the police station but asserted that he did not know what he was signing and did so only so that he could finish and go home. He also admitted to having seen the defendant carrying the knife on three or four previous occasions.

In rebuttal the State recalled Lieutenant Faulkner who testified that the defendant had told him he was not drunk and had not used drugs on the evening the offense

was committed. He also identified a sound recording of defendant's third oral statement, which was admitted and played before the jury. Contrary to Williams' testimony, Sergeant Page then testified as the only other rebuttal witness that Williams had never indicated that the defendant had threatened him.

In his brief the defendant first observes that any proposition premised upon the constitutionality of the imposition of the death penalty under the decisions of the United States Supreme Court in *Furman* [1] and *Witherspoon* [2] has previously been resolved against him by the somewhat recent decisions of this Court in the respective cases of *Williams v. State*, Okl.Cr., 542 P.2d 554 (1975), and *Justus v. State*, Okl. Cr., 542 P.2d 598 (1975).

■ The sole assignment of error is that the homicide was not perpetrated while in violation of 21 O.S.1971 § 843, as required under the provisions of 21 O.S.Supp.1973, § 701.1, ¶ 9, which provides in pertinent part:

"Homicide, when perpetrated without authority of law and with a premeditated design to effect the death of the person killed, or of any other human being, is murder in the first degree in the following cases:

\* \* \* \* \* \*

"9. When perpetrated against a child while in violation of Section 843, Title 21 of the Oklahoma Statutes; . . ."

Title 21 O.S.1971, § 843,[3] originally enacted by H.B. 781, Okl.Sess.Laws 1963, ch. 53, provides:

"Any parent or other person who shall willfully or maliciously beat or injure,

1. See, consolidated cases of *Furman v. Georgia, Jackson v. Georgia,* and *Branch v. Texas,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed. 2d 346 (1972), wherein the Court held that the imposition and carrying out of the death penalty in those cases constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

2. See, *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), where-

in the Court held that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religous scruples against its infliction.

3. This statute was recently amended to increase the range of punishment by H.B. 1079, Okl.Sess.Laws 1975, ch. 250, § 2.

torture, maim, or use unreasonable force upon a child under the age of seventeen (17), or who shall cause, procure or permit any of said acts to be done, shall be punished by imprisonment in the state penitentiary not exceeding five years, or by imprisonment in a county jail not exceeding one year, or by a fine of not more than Five Hundred Dollars ($500.-00), or both such fine and imprisonment."

This assignment is predicated upon the proposition that the Legislatiure only intended 21 O.S.1971, § 843, to apply to an accused who is the parent or one in loco parentis to the child victim. This proposition was also recently rejected by this Court in *Jones v. State,* Okl.Cr., 542 P.2d 1316 (1975), however, the arguments presented by defendant necessitate some further discussion thereof.

Defendant first argues that the intent of the Legislature is apparent when 21 O.S.1971, § 843, is placed in historical perspective to prior legislation. He observes that prior to the enactment of that statute in 1963 there was no penal statute specifically dealing with child beating and such cases were inadequately dealt with under more general legislation proscribing various degrees of assault and battery.[4] Defendant then concludes that the Legislature intended only to provide enhanced punishment and a more adequate deterrent and remedy where the accused was the parent or one in loco parentis to the child and did not contemplate the enactment of legislation of more general applicability. Clearly, in the adoption of that statute the Legislature recognized that children comprise an intrinsically distinguishable class requiring special consideration and intended to promote and foster their welfare. The considerations that led to the enactment of that statute extend beyond the child beating syndrome and encompass the protection of children from whatever source. Therefore, placing this statute in perspective to other legislation, we can perceive no legitimate basis for the distinction now urged, and are of the opinion that historical legislative considerations are perfectly consistent with legislative intent that the statute prohibit such conduct by all.

Defendant next contends that this proposition finds support in the provisions of 21 O.S.1971, § 844, enacted along with 21 O.S.1971, § 843, which states:

"Provided, however, that nothing contained in this Act shall prohibit *any parent, teacher or other person* from using ordinary force *as a means of discipline,* including but not limited to spanking, switching or paddling." (Emphasis added)

He asserts that the emphasized phrases within that statute necessitate the conclusion that the Legislature intended 21 O.S. 1971, § 843, to only apply to an accused who is the parent or one in loco parentis to the child victim. The fallacy with this argument is apparent when we consider that 21 O.S.1971, § 844, is an exclusionary provision wholly independent of the preceding section which defines the offense. This same contention was presented in *Jones,* supra, wherein we held:

"We would agree that the exclusionary provisions of 21 O.S.1971, § 844, are indicative of a Legislative intent that only those lawfully entitled to use force as a means of discipline may avail themselves thereof. However, we cannot agree that the exclusion contained within that provision operates to otherwise limit the preceding section in defining and delineating the crime." (542 P.2d p. 1333)

4. To illustrate the problems encountered in such cases under prior legislation, defendant cites *Bean v. State,* 77 Okl.Cr. 73, 138 P.2d 563 (1943), holding the ordinary human fist to not be a dangerous weapon per se under the predecessor to 21 O.S.1971, § 645, defining assault and battery with a dangerous weapon, and *Herrington v. State,* Okl.Cr., 352 P.2d 931 (1960), holding that an infant was not a decrepit person within the meaning of 21 O.S.1971, § 646, defining aggravated assault and battery.

Finally, the defendant argues that application of the rule of ejusdem generis to the phrase, "Any parent or other person," contained within 21 O.S.1971, § 843, supra, necessitates the conclusion that the Legislature intended the statute to only apply to parents and those in loco parentis to children. In support of this argument defendant cites, among other cases, *Ex parte Carson*, 33 Okl.Cr. 198, 243 P. 260 (1926), and *Ingram v. State*, 51 Okl.Cr. 143, 3 P.2d 736 (1931). This rule of construction is set forth in the first paragraph of the Syllabus to the latter case, as follows:

"Where words of general import and of specific and limited signification are followed by general words, the general words will be construed as embracing only such persons, places, and things as are of like kind or class to those designated by the specific words." [5]

The rationale for the rule was recognized in the case of *Application of Central Airlines*, 199 Okl. 300, 185 P.2d 919, 924, wherein the Oklahoma Supreme Court stated:

"The rule is based upon the obvious reason that if the lawmakers had intended the general words to be used in their unrestricted sense they would have made no mention of the particular classes. 59 C.J. 982, and cases cited."

Indeed, the defendant asks why did the Legislature specifically mention "parent" if they intended that the statute should include everyone? This question was addressed in *Jones,* supra, wherein the defendant argued that the title to the bill enacting this statute similarly limited its applicability to parents and those in loco parentis. In rejecting that contention we therein held:

". . . We are of the opinion that the interpretation now urged upon us would unduly restrict the operation of the language, 'or other person,' as contained in [21 O.S.1971, § 843]. If the Legislature had intended to so restrict that statute, we are persuaded that express terms of limitation would have been employed, and that *the statute expressly extends to parents in emphasis of its applicability to those who exceed the use of lawful force upon a child.* A statute must be held to mean what it plainly expresses and no room is left for construction and interpretation where the language employed is clear and unambiguous. See, *King v. State,* Okl.Cr., 270 P.2d 370 (1954) and *McVicker v. Board of County Com'rs of Co. of Caddo,* Okl., 442 P.2d 297 (1968). . . ." (p. 1333, Emphasis added)

The rule of ejusdem generis is but an aid to be employed in construing a statute along with other rules of construction where legislative intent is uncertain. When possible all words in a statute should be given effect in their ordinary meaning and the Legislature is not presumed to have used superfluous words. In *Ingram,* supra, this Court recognized that the rule should not be employed to defeat legislative intent. Further, in *Wilkins v. State,* 70 Okl.Cr. 1, 104 P.2d 289 (1940), we distinguished the cases now cited by defendant and in the fourth paragraph of the Syllabus thereto stated:

"The term 'ejusdem generis', is recognized as a rule of construction. Its application does not change the rule that courts will endeavor to ascertain the true legislative intent in construing statutes. This legislative intent should be sought in the ordinary meaning of the words of the statute, construed in view of the connection in which they are used, and of the evil to be remedied."

Also see, *Couch v. State,* 71 Okl.Cr. 223, 110 P.2d 613 (1941), and *Curtis v. State,* 78 Okl.Cr. 282, 147 P.2d 465 (1944).

---

5. For a discussion of the rule of ejusdem generis, see: 2A Sutherland, Statutes and Statutory Construction, §§ 47.17–47.22 (4th Ed. 1973); Annot. 39 A.L.R. 1404; Annot. 94 L.Ed. 464; 73 Am.Jur.2d, Statutes, §§ 214–216; 82 C.J.S. Statutes § 332b.

Clearly, the evil at which this statute was directed was the willful or malicious injury of children, and the particular source of the injury should be immaterial to this objective. Moreover, we are persuaded that had the legislature intended to so restrict the operation and effect of this statute, they would have simply adopted a single measure prohibiting the unjustified or unreasonable use of force upon a child by those entitled to use force as a means of discipline, rather than proscribing the unlawful injury of a child in one statute and excluding the ordinary and otherwise lawful use of disciplinary force in a separate statute. In view of the foregoing considerations we are of the opinion that application of the rule of ejusdem generis to this statute would clearly frustrate legislative intent, and hold this proposition to be without merit.[6]

█ In passing we are constrained to observe that had the trial of this case resulted in the conviction of Williams the admission of the defendant's confessions in their joint trial would have necessitated a reversal of Williams' conviction for a new trial. This is for the reason that the defendant's confessions clearly inculpated Williams to an extent not admitted by the latter in his statements and prejudicially deprived Williams of his right to confrontation under the rule announced by the United States Supreme Court in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.E.2d 476 (1968). Also see, *Murray v. State,* Okl.Cr., 528 P.2d 739 (1974). However, the defendant's confessions and Williams' statements were perfectly compatible and not antagonistic to one another with regard to the guilt of the defendant. As to the defendant, the admission of Williams' statements did not therefore constitute a fatally prejudicial violation of the *Bruton* rule. See, *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); and, *Williams,* supra.

Pursuant to Rule 1.11 of this Court, 22 O.S.Supp.1975, Ch. 18, App., this case was previously assigned and heard for oral argument. We have now carefully reviewed the entire record before this Court, and thoroughly considered the argument and authority presented, and have determined that the record is free of any error of law requiring reversal. The judgment and sentence is, accordingly, *AFFIRMED.*

Pursuant to Rule 1.18, 22 O.S.Supp.1975, Ch. 18, App., the defendant is advised that any petition for rehearing herein, must be filed with the Clerk of this Court within fifteen (15) days of the date upon which this opinion is filed therein.

BRETT, P. J., dissents.

BLISS, J., concurs.

BRETT, Presiding Judge (dissents):

I dissent to this decision because I have reached the conclusion that 21 O.S.Supp. 1973, § 701.1, ¶ 9, cannot be correctly interpreted to apply to the facts of this case. I believe now that my concurrence in *Jones v. State,* Okl.Cr., 542 P.2d 1316, was, for the same reason, ill-considered. On reconsideration I would dissent to that decision.

This case brings us again the question of whether it is the intent of 21 O.S.Supp. 1973, § 701.1, ¶ 9, to classify *every* premeditated killing of a child under seventeen (17) years of age as murder in the first degree, punishable by mandatory death.

---

6. See, *United States v. Powell,* 423 U.S. 87, 96 S.Ct. 316, 47 L.Ed.2d 228 (1975), also reported in 44 U.S.L.Week 4010 and 18 Crim. L.Rep. 3013, where in a criminal prosecution for violation of a federal statute prohibiting the mailing of "pistols, revolvers, and 'other firearms capable of being concealed on the person,'" the United States Supreme Court recently refused to apply the doctrine of ejusdem generis to defeat congressional intent as embodied in the statute's plain language and sparse legislative history, and held that the statute was not void for vagueness as applied to a defendant who mailed a sawed-off shotgun 22 inches in length.

I believe that the reasoning used by the majority opinion in determining this question goes wrong in not beginning at the beginning. It leaps ahead to a construction of the terms of 21 O.S.1971, § 843, and loses sight of the fact that the primary statute under consideration is Section 701.1.

The place to begin in the interpretation or consideration of Section 701.1 is with the consideration of whether any interpretation or construction is necessary or proper. If the meaning of a statute is plain when its words are given their ordinary everyday sense, then a court must give it that meaning and is not at liberty to employ rules of interpretation or construction to discover another meaning which may seem more probable or natural. *Shaw v. Grumbine*, 137 Okl.Cr. 95, 278 P. 311. There is room for construction, however, when the words are inherently ambiguous, in conflict with other language of the statute, or lead to an intolerably absurd result. There is a conflict between two provisions of Section 701.1.

That statute is a specific reference statute; that is it refers specifically to Section 843 and adopts the terms of that statute without restating them. After incorporation of the provisions of Section 843 into Section 701.1, the conflict becomes apparent:

"Homicide, when perpetrated without authority of law and with a premeditated design to effect the death of the person killed, or of any other human being, is murder in the first degree in the following cases:

"1. When perpetrated against any peace officer, prosecuting attorney, corrections employee or fireman while engaged in the performance of his official duties;

"2. When perpetrated by one committing or attempting to commit rape, kidnapping for the purpose of extortion, arson in the first degree, armed robbery *or when death occurs following the sexual molestation of a child under the age of sixteen (16) years;*

"3. When perpetrated against any witness subpoenaed to testify at any preliminary hearing, trial or grand jury proceeding against the defendant who kills or procures the killing of the witness, or when perpetrated against any human being while intending to kill such witness;

"4. When perpetrated against the President or Vice President of the United States of America, any official in the line of succession to the Presidency of the United States of America, the Governor or Lieutenant Governor of this state, a judge of any appellate court or court of record of this state, or any person actively engaged in a campaign for the office of the Presidency or Vice Presidency of the United States of America;

"5. When perpetrated by any person engaged in the pirating of an aircraft, train, bus or other commercial vehicle for hire which regularly transports passengers;

"6. When perpetrated by a person who effects the death of a human being in exchange for money or any other thing of value, or by the person procuring the killing;

"7. Murder by a person under a sentence of life imprisonment in the penitentiary;

"8. When perpetrated against two or more persons arising out of the same transaction or occurrence or series of events closely related in time and location.

"9. When perpetrated against a child while in violation of Section 843, Title 21 of the Oklahoma Statutes; [to wit: Any parent or other person who shall willfully or maliciously beat or injure, torture, maim, or use unreasonable force *upon a child under the age of seventeen*

*(17)*, or who shall cause, procure or permit any of said acts to be done, shall be punished by imprisonment . . . ] and

"10. Intentional murder by the unlawful and malicious use of a bomb or of any similar explosive." (Emphasis added)

Paragraph 9 classifies as murder in the first degree a premeditated killing in which the victim is under the age of seventeen (17) years; paragraph 2 classifies as murder in the first degree a premeditated killing in which death follows a sexual act *and* the victim is under the age of sixteen (16) years. The construction by the majority opinion fails to resolve its conflict. If paragraph 9 does in fact include *every* killing of a child under the age of seventeen (17) years, and is not limited to a case in which the killer is a parent, or one in loco parentis, then the words of paragraph 2 are meaningless. Such a construction violates the fundamental rule that a statute is to be construed so as to give meaning to each phrase, clause or section where it is possible so to do. See, *Ex parte Lewis*, 85 Okl.Cr. 322, 188 P.2d 367,

It is also apparent now that if the Legislature intended paragraph 9 to say nothing more than "When perpetrated against a child under the age of seventeen (17) years" as the majority opinion holds, it chose an inexplicably circuitous way of reaching that result.

I believe that the incorporation of Section 843 into paragraph 9 of Section 701.1 had some other meaning. I believe that that paragraph must be construed to apply only to an accused who is the parent of, or who has custody or control over, the child victim. Section 843, as the majority opinion recognizes, is subject to construction. We have held that when a statute is subject to construction, it is proper and a valuable aid to look to the title in interpreting the substance of the

act. *Taylor v. State*, Okl.Cr., 377 P.2d 508; *Brown v. State*, Okl.Cr., 266 P.2d 988. Indeed, the constitution of this State is among those which contain a provision requiring that the subject of a legislative act be clearly expressed in its title. Okl. Const. Art. 5, Sec. 57. The title selected by the Legislature in this instance is some evidence that the opening words of Section 843, "Any parent or other person" were not intended to apply to the world in general. That title is:

"An Act relating to crimes and punishments; providing for a fine and/or imprisonment of any parent or other who shall willfully or maliciously beat or injure, torture, maim, or use unreasonable force, *going beyond that which is necessary for the purpose of discipline and control*; prescribing the circumstances to be considered; and declaring an emergency." (Emphasis added)

Also, the application of the general rule of statutory construction that where general words follow an enumeration of persons or things in words of a particular and specific meaning, such general words are not to be construed in their broadest meaning, but are to be held to include only persons or things of the same kind or class as those specifically mentioned (the rule of ejusdem generis) to the phrase of Section 843 "Any parent or other person," adds more weight to the view that those words are limited and do not apply to the world in general.

The application of a third basic rule of construction also tends to reinforce the view that the prohibition of Section 843 is limited to parents and those in the position of parents. That is the rule that to ascertain the intent of the Legislature, a court may look to each part of the act, and to other statutes on the same subject. *Ex parte Barnett*, 96 Okl.Cr. 254, 252 P.2d 496; *Ex parte Overturff*, 96 Okl.Cr. 262, 252 P.2d 508; *Ex parte Higgs*, 97 Okl.Cr. 338, 263 P.2d 752. In this regard the lan-

guage of Section 844, enacted at the same time as Section 843, is significant:

"Provided, however, that nothing contained in this Act shall prohibit any parent, teacher or other person from using ordinary force as a means of discipline, including but not limited to spanking, switching or paddling."

In that related section, it is clear that the phrase "or other person" means one in a position to discipline the child.

If it does nothing more, the above discussion and application of rules of construction to Section 701.1 with its incorporation of Section 843 illustrates that in Section 701.1 the Legislature has created a doubtful statute, one in which the intention of its makers is less than clear. Criminal statutes must not be construed to extend their provisions to include acts or conduct not clearly within the prohibition of the statute. *Matthews v. Powers*, Okl.Cr., 425 P.2d 479; *Simpson v. State*, 267 P.2d 1008; *Group v. State*, 94 Okl. Cr. 401, 236 P.2d 997. To loosely construe a criminal statute creates the risk of making ex post facto law. With that consideration in mind, I would construe this highly doubtful and confusing paragraph of Section 701.1 strictly, to include only that class of persons clearly within its prohibition: that is, parents and those who are in the position of parents in that they have the duty to care for and control the child.

I would reverse and remand this case for a new trial on a charge of Second Degree Murder.

## ORDER DENYING PETITION FOR REHEARING

Appellant was heretofore sentenced to suffer death for the offense of First Degree Murder in Case No. CRF–74–912 of the District Court, Oklahoma County, and upon appeal that sentence was thereafter affirmed in the above entitled cause on May 24, 1976.

 In his Petition for Rehearing Appellant now advances three further propositions, as follows: (1) that the decision of this Court in *Williams v. State*, Okl.Cr., 542 P.2d 554 (1975), with respect to appellate review and modification of the death sentence under 21 O.S.Supp.1973, §§ 701.5 and 701.6, operated as an ex post facto law to alter the consequences of conviction for First Degree Murder to his disadvantage; (2) that our decision in *Williams* upon the validity of the foregoing appellate review provisions deprived him of an opportunity to establish that the death sentence was discriminatory or disproportionate under the decision of the United States Supreme Court in the consolidated cases of *Furman v. Georgia, Jackson v. Georgia,* and *Branch v. Texas,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); and, (3) that invidious discrimination violative of *Furman* remains within the scheme for the enforcement of capital punishment within this State. However, we are of the opinion that the decision and rationale in *Williams* are fully dispositive of each of these propositions, and Appellant's Petition for Rehearing is therefore DENIED.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Order of this Court staying execution of sentence herein pending appeal be VACATED, and the Clerk of this Court is directed to issue Mandate FORTHWITH.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the judgment and sentence herein appealed from be carried out by the electrocution of the Appellant, Frederick Hamilton Wishon, by the Warden of the State Penitentiary at McAlester, Oklahoma, on Wednesday, September 8, 1976.