**William B. FRANKLIN, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. A–16763.**

Court of Criminal Appeals of Oklahoma.
April 9, 1973.

See also Okl.Cr., 507 P.2d 917.

Ainslie Perrault, Jr., Robert G. Brown, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Raymond Naifeh, Asst. Atty. Gen., for appellee.

OPINION

BRETT, Judge:

Appellant, William B. Franklin, hereinafter referred to as defendant, was charged, tried, and convicted in the District Court of Pittsburgh County, Case No. F–71–106, for the crime of Murder. He was sentenced to death in accordance with the verdict of the jury and a timely appeal has been perfected to this Court.

Prior to trial, on April 30, 1971, a hearing was had pursuant to the defendant's application for admission to Eastern State Hospital for mental observation. Robert G. Brown, one of the defendant's attorneys, took the stand and verified the application. On cross-examination he testified that he had been advised by both the defendant's mother and father that the defendant had sustained a severe head injury which resulted in a change of behavior. The State called to the stand several witnesses who had observed the defendant, for short periods of time, and they testi-

fied that he appeared to be normal. At the conclusion of all of the evidence, the application was denied.

The State's evidence, in chief, showed that on the 17th day of February, 1971, Leo Newton and W. L. Pickens were game rangers at Fountainhead State Park. On that date they heard some gun shots and proceeded in separate cars in search of the source of these shots. Eventually, Pickens came upon the defendant, Franklin, and codefendant Jones. He asked them if they had heard any shots and they replied in the negative. He asked the defendant if he could look in their car and permission was given whereupon he found several weapons. He placed them both under arrest for possession of firearms in a state park and went to look for Leo Newton. The defendant rode in the car with Pickens in search of Newton while the codefendant, Jones, followed in his car. Subsequently, Newton was located driving in the opposite direction and both cars pulled off to the side of the road and Newton pulled in next to them.

At this time the defendant requested that a call be placed to Deputy Sheriff Reed in Okmulgee, Oklahoma. Various conversations were had between the Deputy, Franklin, Pickens and Newton with the result being that Reed informed the rangers to go ahead and "lock them up". Subsequently, the Highway Patrol was called and Trooper Walker arrived in response to that call.

Pickens and Newton got in the car with Trooper Walker while the defendants remained outside. The trooper then searched the codefendant, Jones, and shortly thereafter, the defendant, Franklin, drew a gun and started shooting.

When the shooting started, Pickens ducked down behind the car and heard several more shots and then he was shot. As the result of the outburst of shots, Trooper Walker and Leo Newton were killed.

Pickens testified that the trooper never pulled his gun at any time. After being shot, he blacked out and the next thing he remembered was hearing a motorcycle and

Ranger Newton's son asking him what had happened.

On February 21, 1971, Troopers Backus and Spencer arrested the defendants on a county road. When the troopers first saw the defendants, Franklin threw out his hands and said, "We are the guys you are looking for and we are not armed".

Subsequent to this, the defendants were given the Miranda warning and both indicated that they understood their rights.

Both defendants said that they would discuss anything prior to or after the actual incident, but that they preferred an attorney to be present while being questioned about the actual incident.

Codefendant Jones, then proceeded to relate to the troopers the period of time after the ordeal. At one point during the conversation, Franklin acknowledged the statement of Jones.

The defendant's case, in chief, showed that Franklin, by his testimony, observed an old vehicle that was popping and backfiring in the vicinity of the park. Shortly thereafter, Ranger Pickens approached the defendant and inquired if they had heard shooting and Franklin informed the ranger of the old vehicle. Subsequently, Pickens examined the car and found guns in the backseat. He told the defendants that it was unlawful for them to have guns in the park and asked that the defendant ride with him and that the codefendant, Jones, follow in his car. They left and headed for the airport when they saw Ranger Newton and both cars pulled on to the parking apron. At this point, the defendant asked the ranger to call Deputy Reed. After a brief conversation with Reed, he informed the defendant that there was nothing that he could do for him. Approximately five minutes after this, Trooper Walker arrived. According to Franklin's testimony, they waited in their car while the trooper took their identification and they went back to his car to talk with the two rangers. Subsequently, the trooper placed the two defendants under arrest.

Franklin testified that at this point he became concerned about a pistol in his shoulder holster. He removed the pistol, holding it by the butt with two fingers. Ranger Pickens then started screaming, "Look out, look out, he has got a gun". The defendant heard a shot and turned and saw the trooper firing at him. At this point, the trooper dove behind the car while the defendant, Franklin, started firing at him. Franklin fell to the ground, rolled over and fired at Newton. After this round of fire, the defendant observed the trooper running backwards, away from him. He opened fire and the trooper fell. The defendant then approached the trooper and he made a motion as if to fire again so defendant fired and the trooper went limp. Defendant testified that he had no idea of what had happened to Ranger Pickens.

Defendant called several witnesses who testified that the defendant's behavior pattern was changed prior to this incident by a severe blow on the head in 1958.

■ The defendant's first proposition of error alleges that the trial court erred in not following the laws of the State of Oklahoma with respect to sending this defendant to Eastern State Hospital at Vinita, Oklahoma, for observation not to exceed sixty days.

The defendant cites two cases in support of his proposition: French v. State, Okl. Cr., 397 P.2d 909 (1964), and Johnson v. State, 73 Okl.Cr. 370, 121 P.2d 625 (1942). In *French,* supra, we stated:

"Had the trial court only the statement of counsel, under oath, of his opinion of the defendant's sanity, *after several conferences with him* and nothing else . . . this Court would agree that the trial court would have been remiss in not granting the defendant a trial to determine present sanity." (Emphasis added)

*French,* supra, differs from the principal case in that the attorney for the defense stated under oath that he had not yet conferred with the defendant. There must be some facts upon which an attorney may base his opinion as to present sanity. This Court feels that an assumption of insanity on the part of an attorney for his client must be based on more than mere suspicion, as was the case here.

In *Johnson,* supra, the defendant cited the following:

"We are satisfied that the trial judge, personally, had no doubt of defendant's sanity; yet the motion and affidavit, *together with the statement of counsel, are sufficient to legally raise a doubt.*" (Emphasis added)

In the principal case, the defendant's attorney was asked these questions and gave the following answers:

"Q. It is your opinion as a lawyer the defendant, William Franklin, does not have the present ability to consult with you. Is that correct?

"A. I can't say that in all honesty, no.

\*   \*   \*   \*   \*   \*

"Q. . . . Then it is your opinion he can aid and assist you in the presentation of his defense in the trial of this case?

"A. Yes, but I have some reservations about it.

"Q. Your answer is yes. Does he have an actual understanding of the proceedings against him?

"A. Yes."

It is evident from the above testimony that the defendant's attorney never once said that the defendant was not able to assist him in his defense. In fact, he indicated the opposite. It is clear in *Johnson,* supra, that counsel's statement as to present insanity, is a necessary element to raise a reasonable doubt in the mind of the trial court. Therefore, the trial court properly denied the defendant's motion for commitment.

■ Defendant's second proposition of error alleges that the trial court erred in overruling the defendant's motion to suppress certain evidence which allegedly had been obtained unlawfully, illegally and in violation of the defendant's constitutional

rights. Defendant cites Miranda v. Arizona, 384 U.S. 478, 86 S.Ct. 1602, 16 L.Ed.2d 726 (1966) in support thereof.

It is the opinion of this Court that the evidence complained of by the defendant was obtained lawfully and well within the boundary set forth in *Miranda,* supra. In that case the U. S. Supreme Court said:

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. *Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence* . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." (Emphasis added)

This Court in examining all the evidence before it, considered the statements from the defendant to have been given voluntarily without any compelling influence. The defendant said that he would discuss anything before or after the incident but that he wanted to consult with an attorney before talking about the incident itself. The officers then took the statements of the defendant as to the time before and after the incident and never questioned him concerning the actual incident.

It is next contended by defendant that the trial court erred in admitting the statements of the codefendant, when the court had granted a severance between the two defendants.

The defendant cites the case of Gossett v. State, Okl.Cr., 373 P.2d 285 (1962), in which this Court said:

"It is error in the trial of a criminal case for the court to admit testimony as to declarations between an officer who had accused under arrest and the state's witnesses, or other persons, in the presence of the accused, tending to connect him with the offense charged, *and that the accused remained silent as to such conversation;* and when the conviction results with such testimony before the

jury a new trial will be granted." (Emphasis added)

We are of the opinion that this case is distinguishable from *Gossett,* supra, in that in this case the defendant did not remain silent. These questions were asked Trooper Backus at the trial:

"Q. All right, and what did Defendant Jones [Franklin] say?

"A. Franklin?

"Q. I mean Franklin.

"A. Mr. Franklin said that anything prior to the incident or after the incident he would go into it, but as far as the incident itself, he would like to have an attorney present.

\* \* \* \* \* \*

"Q. All right, now was there any conversation said by Mr. Jones and acknowledged by Mr. Franklin as to what took place while they were at the hiding place that you referred to?

"A. Yes sir.

"Q. And what was that please?

"A. That they had seen airplanes fly over, at one time they had seen a searching party, and at one time they had heard some dogs that appeared to be pretty close to them, they talked about how cold it was, they also said that they were not the persons who had broken into a house and had stolen some food, that they had not left their immediate encampment and that they had some water and had nothing to eat."

When the defendant acknowledged the statements of Jones, he ended his silence in the matter and voluntarily waived his constitutional rights to remain silent.

In Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) the Supreme Court of the United States said:

"The mere finding of a violation of the Bruton rule in the course of the trial, however, does not automatically require reversal of the ensuing criminal convic-

tion. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error."

█ It is the opinion of this Court that even if the codefendant's remarks were erroneously admitted into evidence, it constitutes a harmless error under *Schneble*, supra, in that the prejudicial effect of the codefendant's admission was vastly outweighed by the evidence of guilt.

In accordance with the previous order of this Court, 507 P.2d 917, the death sentence is hereby modified to life imprisonment.

Modified and affirmed.

BLISS, P. J., and BUSSEY, J., concur.